**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**ANTHONY COUCH,** *et al.,*

       **Plaintiffs,** *on their own*
       *behalfs, and for all others*
       *similarly situated,*

          **Case No. 1:19-cv-59**
    **v.**          **JUDGE DOUGLAS R. COLE**

**CERTIFIED FLOORING**
**INSTALLATION, INC.,**

       **Defendant.**

## OPINION AND ORDER

This case under the Fair Labor Standards Act ("FLSA") and related state laws comes before the Court on Plaintiffs' Motion for Conditional Class Certification and Court-Supervised Notice to Potential Opt-In Plaintiffs ("Motion for Conditional Certification") (Doc. 8), and Defendant Certified Flooring Installation, Inc.'s ("CFI") Motion to Dismiss the First Amended Complaint of Plaintiff Anthony Couch or, in the Alternative, Motion for Summary Judgment ("Motion to Dismiss") (Doc. 10). For the reasons set forth below, the Court **GRANTS** Plaintiffs' Motion for Conditional Certification (Doc. 8), and **DENIES** Defendant's Motion to Dismiss (Doc. 10).

## I.    FACTUAL BACKGROUND

### A.    Plaintiff Carpet Installers Allege CFI Wrongly Failed to Pay Them Overtime.

Plaintiffs Anthony Couch, Bradlee Belser, Tyler Hensley, and Nicholas Muccillo (collectively "Plaintiffs") allege they started working for CFI as carpet

installers at various points in 2016. (Couch Decl., ¶ 3, Doc. 8-1, #51; Belser Decl., ¶ 3, Doc. 8-2, #54; Hensley Decl., ¶ 3, Doc. 8-3, #57; Muccillo Decl., ¶ 3, Doc. 8-4, #60). As carpet installers, Plaintiffs installed new carpet, removed and hauled away old carpet, moved furniture, and traveled between locations to perform jobs. (Belser Decl., ¶ 6, #54). CFI purportedly paid Plaintiffs on a piece-rate basis, regardless of the number of hours they worked in a work-week. For example, CFI paid Belser $1.65 for each square yard of carpet that he laid, $0.04 for each square yard of carpet and padding that he removed and hauled away, and $0.04 for each square yard of carpet from which furniture was picked up and moved. (*Id*., ¶ 7, #55). The other Plaintiffs were paid comparably. Plaintiffs allege they all worked over 40 hours per week—typically between 55 and 62.5 hours per week—and yet they never received overtime pay. (*See, e.g.*, *id*., ¶ 11, #56).

### B. Plaintiff Anthony Couch Files for Bankruptcy But Does Not Disclose His FLSA Claim.

On January 8, 2018, Couch filed a voluntary petition for Chapter 7 bankruptcy in the bankruptcy court for the United States District Court for the Southern District of Ohio. (*See* Schedule A/B: Property, Doc. 10-2, #98–140). It is undisputed that Couch did not disclose this potential unpaid overtime claim against CFI on "Schedule A/B" in his bankruptcy filings, the schedule that is intended to list, among other assets, any legal claims the debtor may have against third parties. (*See* Pls.' Opp'n to Mot. to Dismiss, Doc. 16, #186). Couch signed the bankruptcy petition under penalty of perjury. (Schedule A/B: Property, #133). Later that same month, on January 22, 2018, CFI terminated Couch. (*See* First Am. Compl., ¶ 15, Doc. 7, #23).

On April 4, 2018, about three months later—while Couch's Chapter 7 bankruptcy was still pending—Couch signed a Notice of Consent to bring this FLSA action. (*See* Notice of Consent, Doc. 7-1, #32). The Notice of Consent stated:

> I hereby consent, opt-in, and agree to become a party-plaintiff in the above-referenced action. I agree to be represented by Gibson Law, LLC. I understand that this lawsuit is being brought under the Fair Labor Standards Act. In addition, I understand that by filing this consent, I will be bound by the judgment of this Court on all issues in this case.

(*Id.*).

Couch claims "on more than two occasions during [his] bankruptcy proceeding, [he] advised his bankruptcy attorney, Michael Smith, that [he] had a potential claim for unpaid overtime wages against" CFI. (Couch Decl., ¶ 4, #196). On each occasion, Couch states Mr. Smith "advised [him] that it was not necessary to disclose these claims to the Bankruptcy Court, as he believed that there was a significant possibility that the overtime case would never be filed." (*Id.*, ¶ 5). Couch "relied on Mr. Smith's advice to make [his] decision to not disclose [his] unpaid overtime claims[.]" (*Id.*, ¶ 6). Couch "would have disclosed those claims had [he] received advice that it was proper to do so." (*Id.*).

Based on Couch's filings, the bankruptcy court discharged all of Couch's debts on August 17, 2018, (*see* Order of Discharge, Doc. 10-3, #141–42), and closed Couch's case on February 6, 2019. (*See* Case Summary, Doc. 10-4, #143). Couch never amended his bankruptcy filings before that time to include his FLSA claim.

On January 24, 2019, months after the bankruptcy court entered the discharge, but about two weeks before the bankruptcy court closed his bankruptcy,

Couch filed the Complaint in this action. (*See* Compl., Doc. 1, #1). After receiving the Complaint, CFI's attorney, Robert Winter, started conducting due diligence. (*See* Winter Decl., ¶ 2, Doc. 19-1, #236). Winter discovered that Couch had failed to list this action in his Schedule A/B when originally filed with the bankruptcy court. (*Id.*, ¶ 2, #236–37). After Couch's bankruptcy case closed in February, Winter also realized Couch never amended his Schedule A/B to include this case. (*Id.*, ¶ 3, #237). On February 11, 2019, Winter sent Couch's attorneys a letter noting that Couch failed to disclose this lawsuit to the bankruptcy court and demanding that Couch dismiss his lawsuit based on judicial estoppel. (*See id.*, #240).

A little over a month later, at 2:36 p.m. on March 20, 2019, Couch filed to reopen his Chapter 7 bankruptcy case. (*See* Debtor's Am. Mot. to Reopen Case, Doc. 16-2, #200). Later that same day, at 7:25 p.m., CFI filed its Motion to Dismiss here. (*See* Mot. to Dismiss, Doc. 10, #72). After the bankruptcy court reopened his bankruptcy proceeding, Couch amended his Schedule A/B on April 17, 2019, to include this lawsuit. (*See* Schedule A/B: Property, #205–07).

## C. **Pending Motions.**

The Plaintiffs assert three claims in their First Amended Complaint: (1) a Fair Labor Standards Act ("FLSA") collective action claim; (2) an Ohio Minimum Fair Wage Standards Act claim; and (3) a Kentucky failure to pay overtime claim. (*See* First Am. Compl., ¶¶ 42–66, Doc. 7, #26–29). Couch also seeks to certify an FLSA collective action on behalf of himself and all other similarly situated individuals, which the Complaint describes as "[a]ll current and former Carpet Installers

4

employed by Defendant who worked over forty hours in any workweek beginning January 24, 2016 though the present and were not paid time and a half for the hours worked over forty." (*Id.*, ¶ 43, #27).

In his Motion for Conditional Certification, Couch requests that the Court (1) conditionally certify the FLSA class defined above and (2) implement a procedure for sending Court-approved notice to potential opt-in plaintiffs. (*See* Mot. for Conditional Cert., Doc. 8, #36). CFI opposes Couch's request for conditional certification and argues in a separate motion that Couch's claims should be dismissed. (*Id.*, #176–79; Def.'s Mot. to Dismiss, Doc. 10). In its Motion to Dismiss, CFI asks the Court to hold that Couch is judicially estopped from bringing his claims based on his failure to disclose his potential claims against CFI in his Chapter 7 bankruptcy filings.

## II. DISCUSSION

### A. CFI's Motion to Dismiss.

The Court starts with CFI's Motion to Dismiss Couch's claims. As noted above, in that motion, CFI argues that Couch is judicially estopped from joining the current action because he failed to disclose this claim against CFI in his previous bankruptcy action. For the reasons that follow, the Court **DENIES** the Motion to Dismiss.

### 1. *Standard of Review.*

When deciding a Rule 12(b)(6) motion, a court may consider "the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett*

*v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). While the bankruptcy records both parties attach to their briefs are considered public records, *see Thomas v. Procter & Gamble Distrib., LLC*, No. 1:11-cv-796, 2012 WL 4107868, at *1 n.2 (S.D. Ohio Sept. 19, 2012), the declarations are not. These declarations constitute materials outside the pleadings.

The Court has discretion to consider materials outside the pleadings when ruling on a Rule 12(b)(6) motion, but doing so converts the motion into one for summary judgment. *See* Fed. R. Civ. P. 12(d); *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 487 (6th Cir. 2009). The Court may enter summary judgment, but only if the losing party is on notice that the party was required to come forward with all of its evidence relevant to the issue. *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 204 (6th Cir. 1998). A party is not on notice if the party is likely to be surprised by the Court's decision to treat a motion as one for summary judgment. *Id.* But, a party cannot claim surprise "when the party was aware that materials outside the pleading had been submitted to the court before the court granted the motion." *Song v. City of Elyria*, 985 F.2d 840, 842 (6th Cir. 1993).

Here, neither party can claim surprise, as both parties knowingly elected to submit materials outside the pleadings. (*See* Couch Decl., #196–97; Winter Decl., #236–42). Moreover, CFI, the losing party here (and thus the only party that could potentially suffer prejudice as a result of the Court treating the motion as one for summary judgment), specifically asked the Court to consider the materials and convert its motion into one for summary judgment (at least in the alternative), and

6

so cannot claim prejudice as a result of the Court acquiescing to that request. The Court therefore treats the pending Motion to Dismiss as one in which CFI seeks summary judgment on the judicial estoppel issue, and considers all of the materials that the parties have presented on that question.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine disputes of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993).

The existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment). But, in determining whether a genuine dispute exists, the evidence must be viewed in the light most

favorable to the non-moving party, and a court cannot make credibility determinations or weigh the evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the non-moving party and must refrain from making credibility determinations or weighing evidence).

### 2. *Analysis of CFI's Motion to Dismiss on Estoppel Grounds.*

Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). This doctrine preserves "the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship." *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002). Judicial estoppel is an equitable doctrine that can be invoked at the Court's discretion. *Pennycuff v. Fentress Cty. Bd. of Educ.*, 404 F.3d 447, 453 (6th Cir. 2005). The Supreme Court has emphasized that there are no "inflexible prerequisites," nor is there an "exhaustive formula," for determining the applicability of judicial estoppel. *New Hampshire*, 532 U.S. at 751.

In the bankruptcy context, the Sixth Circuit has articulated three considerations that are typically relevant when determining if judicial estoppel should apply: (1) the party asserts a position that was contrary to the one the party had asserted under oath in a prior proceeding; (2) the prior court adopted the contrary position either as a preliminary matter or as part of a final disposition; and (3) the

party's omission was not a result of mistake or inadvertence. *White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 476 (6th Cir. 2010). As to the third prong, a party's failure to disclose could be deemed a mistake or inadvertent if: (1) the party lacked knowledge of the factual basis of the undisclosed claims; (2) the party had no motive for concealment; and (3) there is an absence of bad faith. *Id.* at 476–77.

CFI's judicial estoppel argument here rests on Couch's violation of the Bankruptcy Code's requirement that a debtor must file "a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs." 11 U.S.C. § 521(1). "It is well-settled that a cause of action is an asset that must be scheduled under § 521(1)." *Lewis v. Weyerhaeuser Co.*, 141 F. App'x 420, 424 (6th Cir. 2005). A debtor is required to disclose all potential causes of action, and, because this duty to disclose is continuous, this includes even those of which the party becomes aware after filing for bankruptcy. *Id.* It is undisputed that Couch did not disclose his cause of action against CFI in his bankruptcy filings.

Couch does not contest that the position that he seeks to assert here (that he has a claim against CFI) is contrary to representations he made under oath in the bankruptcy proceeding. (*See* Pls.' Resp. in Opp'n to Mot. to Dismiss, #189). Nor does he dispute that the bankruptcy court adopted the contrary position that he asserted there. *Id.* Instead, Couch argues his omission was the result of a mistake. And, as for the three-prong test for mistake as a defense to judicial estoppel, Couch concedes that he had knowledge of the factual basis for his undisclosed FLSA claim (prong 1), *see*

9

*White*, 617 F.3d at 476, and courts have repeatedly held that the financial incentive to avoid disclosing the claim in bankruptcy (thus allowing the debtor potentially to keep the proceeds for him- or herself) is sufficient evidence of a "motive for concealment" (prong 2). *See id.* at 479 (noting White had a motive to conceal the claim and keep the money for herself instead of using it to satisfy her debts); *see also Lewis*, 141 F. App'x at 426 ("It is always in a [bankruptcy] petitioner's interest to minimize income and assets.").

Thus, at the end of the day, the judicial estoppel inquiry here rests on the third prong—the alleged absence of bad faith—which is a central focus of Couch's opposition to CFI's motion. In that regard, Couch notes that: (1) he incorrectly relied on his attorney's advice not to disclose his potential FLSA claim in the first instance; (2) he sought to reopen the bankruptcy case to disclose this claim; and (3) he did so before receiving CFI's Motion to Dismiss, rather than only in response to that motion. (*See* Pls.' Resp. in Opp'n to Mot. to Dismiss, #189). Couch contends that this is sufficient to show that he did not act in bad faith, or at least to avoid summary judgment on judicial estoppel grounds.

The Sixth Circuit has made clear that the bad faith analysis for applying judicial estoppel in the bankruptcy context generally focuses on three attributes: effort, effectiveness, and timing. To avoid estoppel, a party generally must show they made a good-faith, effective effort to inform the bankruptcy court about the potential claim. *See, e.g.*, *Eubanks v. CBSK Fin. Grp., Inc.*, 385 F.3d 894, 898–99 (6th Cir. 2004). Likewise, a court is less inclined to find bad faith when the party attempted to

inform the bankruptcy court about the potential action *before* a motion to dismiss forced the party's hand. *See, e.g.*, *Newman v. Univ. of Dayton*, 751 F. App'x 809, 814–15 (6th Cir. 2018). With these considerations in mind, and drawing all reasonable inferences in Couch's favor, the Court finds that there is at least a genuine dispute as to whether Couch acted in bad faith, meaning that CFI is not entitled to summary judgment on judicial estoppel grounds.

*Effort and effectiveness*. In assessing bad faith, a court begins with an examination of the party's efforts (or lack thereof) in notifying the bankruptcy court of the potential claim. The Sixth Circuit has held that where a party's original omission is sufficiently egregious, the original omission, in and of itself, can be sufficient to support a finding of bad faith, notwithstanding later efforts to correct it. *See Lewis*, 141 F. App'x at 428–29. To illustrate, in *Lewis*, the plaintiff asserted an employment discrimination claim against the defendant, but the defendant moved for summary judgment on judicial estoppel grounds, arguing that the plaintiff had not disclosed the potential discrimination claim as an asset in her previous bankruptcy. *Id.* at 422. In affirming the district court's dismissal of the discrimination action on estoppel grounds, the Sixth Circuit stressed the importance of the plaintiff's "minimal alleged effort" in the bankruptcy action. *Id.* at 427. In particular, the Sixth Circuit noted that, not only had Lewis never amended her bankruptcy schedules to reveal the claim, but she also failed to disclose that she had even worked for the defendant. *Id.* at 428. The court found that the egregious nature of the latter omission—the plaintiff's failure even to disclose the defendant *as an employer at all*,

despite the clear requirement that she do so—was sufficient to show that the plaintiff had acted in bad faith. *Id.* at 428–29. It was such a basic error, and such a clear requirement, that the court simply could not conclude that the error was made in good faith.

Here, though, the alleged nondisclosure is not of the same nature as that at issue in *Lewis*. Couch did not try to hide the fact that he had worked for CFI at all, but rather merely failed to apprise the bankruptcy court when, at a post-filing stage of the bankruptcy process, it became apparent that he may have a claim against that employer. Given that distinction, the Court finds that the omission here does not necessarily give rise to the same inference of intent that was at issue in *Lewis*. This is not the kind of non-disclosure that would have been painfully obvious to any person, whether trained in the law or not.

Stated differently, one need not rely on much by way of legal advice to know that they have inaccurately answered the question—who were your employers during the past year? But a person may need, and is more likely to rely on, legal advice regarding just how certain a potential, but not yet filed, claim must be before a disclosure obligation arises. That is the issue that Couch claims occurred here, and that distinction means that *Lewis* does not compel a finding that Couch acted in bad faith when he allegedly relied on his attorney's advice that no disclosure was required.

That his original omission does not justify a finding of bad faith is further evidenced by Couch's corrective efforts. Couch went beyond merely moving to amend

his claim to the bankruptcy court. He also has communicated with the Trustee of his bankruptcy case to ensure that the matter is handled appropriately. (*See* Pls.' Resp. in Opp'n to Mot. to Dismiss, #191). The Trustee even filed a motion supporting Couch and urging this Court not to find Couch acted in bad faith. (*See* Trustee's Memo. in Supp. of Pls.' Opp'n to Mot. to Dismiss, Doc. 18, #218–19). All these facts weigh towards finding that Couch did not act in bad faith.

CFI responds to such arguments by claiming that advice of counsel is not a defense to judicial estoppel, meaning that Couch's claims that he sought such advice should be irrelevant to the estoppel analysis. (*See* Def.'s Reply in Supp. of Mot. to Dismiss, Doc. 19, #226–30). To CFI's credit, case law holds that it is generally true that a litigant is bound by his attorney's errors, such that advice of counsel is typically not a shield to estoppel. *See Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34 (1962). But that admonition appears to apply with particular force to omissions that are "so blatant that [the plaintiff] could not have fairly relied on the alleged advice of counsel." *Newman*, 751 F. App'x at 815.

For example, the plaintiff in *Newman*, an educated attorney and professor, falsely stated multiple times in his bankruptcy filings he had $0 income even though he worked part-time. *Id.* The Sixth Circuit refused to allow the plaintiff to hide behind his counsel's mistakes because the omissions were so obvious, "especially in light of [the plaintiff's] sophistication as an attorney and professor[.]" *Id.* Similarly, the Sixth Circuit has found it difficult to believe a party relied in good faith on the advice of the attorney's paralegal in answering a bankruptcy question, *see Lewis*, 141 F. App'x at

13

427, especially when, as discussed above, the question at issue—who were your employers?—was one any reasonable lay person should be able to answer.

Here, by contrast, as already discussed above, drawing all reasonable inferences in Couch's favor, the omission that Couch made—allegedly on the advice of his bankruptcy attorney—was not so blatant an error that Couch necessarily could not be said to "have fairly relied on the alleged advice." *Newman*, 751 F. App'x at 815. And there is certainly credible evidence here that Couch sought such advice. Couch spoke with his attorney directly at least two times during his bankruptcy proceedings about the potential claim. (*See* Couch Decl., ¶ 4, #196). His attorney told Couch he was not required to disclose this potential lawsuit because of its speculativeness, and Couch followed that advice. (*Id.*, ¶¶ 5, 6). Couch would have disclosed the potential claim had he not received that advice. (*Id.*, ¶ 6). While Couch may have received bad advice, there is a strong argument that Couch relied on that advice and did so in good faith. Moreover, while the speculativeness surrounding whether the suit would be filed ultimately disappeared, certainly no later than when Couch filed the action in early 2019, it is also reasonable to believe that, having been advised before the discharge happened in August 2018 that he did not need to disclose the lawsuit, Couch simply did not realize that he needed to make any more disclosures or corrections post-discharge.

*Timing*. Suspicious timing can lead a court to question a party's motives. For example, a court is more willing to find bad faith when a party files a lawsuit shortly after the party's bankruptcy plan was approved. *See Lewis*, 141 F. App'x at 428; *see*

14

*also White*, 617 F.3d at 482 (factoring how the plaintiff "waited until just after the [bankruptcy] plan confirmation hearing to file her harassment claim with the district court" into its decision finding bad faith). Such questionable timing suggests that the party knowingly waited until after the bankruptcy closed to initiate the later lawsuit, in hopes that they would not need to share the proceeds of such action with the creditors of the bankruptcy estate. For related reasons, timing considerations also apply to a party's efforts to correct an omission—such efforts before a defendant files a motion to dismiss in the subsequent case are more important than efforts that the party makes after a defendant has filed such a motion. *Id.* at 481; *see also Newman*, 751 F. App'x at 814–15 (refusing to find inadvertence because the plaintiff attempted to amend his bankruptcy plans only after the defendants moved to dismiss the lawsuit). The general point is that such timing indicates a party only became "honest" with the bankruptcy court after he was forced to.

In fairness, the timing here admittedly raises some suspicion. CFI's counsel sent Couch a letter on February 11, 2019, demanding Couch dismiss this lawsuit based on the bankruptcy non-disclosure. (*See* Winter Decl., Ex. A., #240–42). Couch then moved to amend his bankruptcy filings—and disclose this lawsuit for the first time—on March 20, 2019. (*See* Debtor's Am. Mot. to Reopen Case, Doc. 16-2, #200). CFI argues that Couch received this letter, realized he had been caught in the act, and then moved to amend his bankruptcy filings so this Court would not dismiss the lawsuit. But, drawing all reasonable inferences in Couch's favor, there is another explanation: Couch received CFI's letter and genuinely realized for the first time he

15

made a mistake in not listing the claim. On the state of the record now, reasonable minds can reach two conclusions. As the Court is required to view the evidence in the light most favorable to the non-moving party in addressing a motion for summary judgment, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970), the Court adopts the latter interpretation.

The Court's hesitance to estop Couch finds further support in the Sixth Circuit's observation that judicial estoppel "should be applied with caution to avoid impinging on the truth-seeking function of the court[.]" *Eubanks*, 385 F.3d at 897 (internal quotation omitted). Estopping Couch would do just that. Couch certainly made a mistake by failing to disclose this lawsuit in his bankruptcy, but it is possible that it was an innocent mistake, and there is no question that Couch rectified that mistake by reopening his bankruptcy proceedings.

Some hesitancy in imposing estoppel is also warranted given how judicial estoppel plays out in the bankruptcy context. A party, here CFI, is claimed to be wrongly holding an asset (additional income owed to Couch) that belongs to the estate. Collecting that asset would benefit not merely Couch (and maybe not Couch at all), but also the creditors of Couch's bankruptcy estate, which explains why the Bankruptcy Trustee is supporting Couch. Applying judicial estoppel to such a claim means that the alleged wrongdoer (CFI) keeps a windfall to the detriment of the estate creditors. *See Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1187–88 (11th Cir. 2017).

To be sure, the existence of judicial estoppel may provide salutary consequences for the bankruptcy system as a whole, as it creates incentives for debtors to disclose their potential claims. Absent such estoppel, as CFI observes, the debtor's preferred play in bankruptcy may be a strong presumption in favor of nondisclosure, in hopes of pursuing the claim post-discharge (when the proceeds won't need to be shared with the creditors), secure in the knowledge that, at worst, the debtor comes out even if the claim is discovered down the road. *See White*, 617 F.3d at 481 n.10 (noting that, by refusing to judicially estop a party who wrongfully failed to disclose the existence of a potential claim in bankruptcy, the court effectively allows the party to avoid the consequences of failing to disclose that claim). But, while such incentives arguments favor recognizing estoppel generally, the detrimental impact on the estate creditors in the particular cases in which it is applied counsel strongly in favor of respecting the Sixth Circuit's admonition that it should be "applied with caution," *Eubanks*, 385 F.3d at 897, or in other words that estoppel should be enforced only when it is clearly warranted on the facts. That standard is not met here.

For these reasons, the Court treats CFI's motion asserting judicial estoppel as a motion for summary judgment and **DENIES** that motion.

### B.     Plaintiffs' Motion for Preliminary Class Certification.

Separately, Plaintiffs ask this Court to conditionally certify a class that includes "[a]ll current and former Carpet Installers employed by Defendant who worked over forty hours in any workweek beginning January 24, 2016 though the

present and were not paid time and a half for the hours worked over forty." (*See* First Am. Compl., ¶ 43, #27). In response, CFI makes a variety of arguments. First, CFI claims that the Court should ignore any information relating to Couch, due to the Motion to Dismiss Couch on estoppel grounds. Given the Court's denial of that Motion, though, the Court need not address that argument further here.

Second, CFI argues that certain language that Plaintiffs used to describe the class in the proposed Notice of Rights (Doc. 8-5)—which differs slightly from the language in the class definition in the Amended Complaint—renders conditional certification inappropriate. More specifically, CFI claims that the class, under the definition in the Notice, fails the "similarly situated" requirement, and that the Plaintiffs' "speculation" regarding how other carpet installers are paid makes the class "unmanageable." (*See* Def.'s Resp. in Opp'n to Mot. for Conditional Cert., Doc. 14, #177–79). The Court rejects CFI's arguments, however, and finds that Plaintiffs have proposed an acceptable putative class for their proposed collective action, especially given the "minimal burden" that applies at the conditional certification stage of an FLSA case.

### 1. *The Burden For Conditional Certification At This Stage Is Low.*

The FLSA mandates that employers pay employees at least a specified minimum wage for each hour worked, *see* 29 U.S.C. § 206, and overtime for working more than forty hours per week. *See* 29 U.S.C. § 207(a)(1); *Chao v. Tradesmen Int'l, Inc.*, 310 F.3d 904, 907 (6th Cir. 2002). If an employer fails to follow the FLSA mandate, employees can sue their employer in a collective action to recover the

unpaid wages. *See* 29 U.S.C. § 216(b). There are two requirements for this collective action. The plaintiffs must (1) be "similarly situated" and (2) signal in writing their affirmative consent to participate in the action. *See id.*; *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006). That is, unlike traditional "opt out" classes under Rule 23, an FLSA collective action claim is essentially an "opt in" class.

Courts follow a two-step process for determining if an FLSA case should proceed as a collective action. *See Abner v. Convergys Corp.*, No. 1:18-cv-442, 2019 WL 1573201, at *4 (S.D. Ohio Apr. 11, 2019). First, the Court must determine whether to conditionally certify the FLSA class and whether notice of the lawsuit should be given to putative class members. *Id; see also Comer*, 454 F.3d at 546–47. Because this stage generally occurs at the beginning of discovery, the Court uses a "fairly lenient standard" that "typically results in conditional certification[.]" *Id.* at 547 (internal quotations omitted). Plaintiffs need only make a "modest factual showing" that they are similarly situated to the putative class members. *Id.* The second stage occurs after discovery has concluded. *Id.* At that point, the Defendant may file a motion to decertify the class and the Court will examine the class with greater scrutiny. *See id.* This action is currently at the first stage.

### 2. *The Plaintiffs Met Their Certification Burden Here.*

Under the lenient standard that applies at the first stage of an FLSA collective action, Plaintiffs can show they are similarly situated to the members of the proposed class by demonstrating that all of the members of the proposed class "suffer from a single, FLSA-violating policy" or have claims that are "unified by common theories of

defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct." *Monroe v. FTS USA, LLC*, 860 F.3d 389, 398, 403 (6th Cir. 2017) (citing *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 585 (6th Cir. 2009)). Courts have also identified various factors that can assist with this analysis: (1) if the party seeking conditional certification has identified other potential plaintiffs; (2) if the party seeking such certification includes affidavits of such potential plaintiffs; (3) if the party submits evidence of a widespread unlawful policy or practice; and (4) if a manageable class exists (a topic revisited below). *Lewis v. Huntington Nat'l Bank*, 789 F. Supp. 2d 863, 868 (S.D. Ohio 2011).

Here, Plaintiffs have made the necessary showing regarding the similarly situated requirement in at least two ways. First, the declarations from the four separate carpet installers show that each was paid in an identical fashion, and that none of them received any enhancement to their pay for hours worked above forty in a given week. (Couch Decl., ¶¶ 6, 9, #52; Belser Decl., ¶¶ 7–8, 11, #55–56; Hensley Decl., ¶¶ 7–8, 11, #58–59; Muccillo Decl., ¶¶ 7, 10, #61). Second, two of the declarations aver that senior management personnel at CFI told the declarants and other carpet installers in their presence that they would all be paid in the same manner, and that the "pay rates were going to remain constant, regardless of the number of hours we worked in a workweek." (Belser Decl., ¶ 7, #55; Hensley Decl., ¶ 7, #58). The four declarants likewise all aver that they worked with, or witnessed, multiple other carpet installers working roughly the same hours that the declarants did. (Couch Decl., ¶¶ 5, 10, #51–52; Belser Decl., ¶¶ 6, 12, #54, #56; Hensley Decl.,

20

¶¶ 6, 12, #57, #59; Muccillo Decl., ¶¶ 6, 11, #61). Such assertions give rise to at least an inference that all carpet installers are paid in a similar fashion, and that no carpet installers received overtime pay. And that inference is more than sufficient for Plaintiffs to meet the minimal burden they bear at this juncture to show that CFI's carpet installers are "similarly situated" for FLSA collective-action purposes.

These same facts also support certification under the four factors described in *Lewis.* 789 F. Supp. 2d at 868. First, Plaintiffs identified other potential plaintiffs—they stated in their declarations that they observed other carpet installers performing similar job functions and working similar hours each day. (Couch Decl., ¶¶ 5, 10, #51–52; Belser Decl., ¶¶ 6, 12, #54, #56; Hensley Decl., ¶¶ 6, 12, #58–59; Muccillo Decl., ¶¶ 6, 11, #60–61). Second, the four named Plaintiffs each submitted a declaration in support of the claims. Third, as noted above, the Plaintiffs' declarations allow at least an inference of a widespread unlawful policy or plan of not paying overtime. Lastly, Plaintiffs proposed a manageable class of approximately 100 carpet installers, who are all allegedly victims of the same policy, and whose employment and pay history can be established through CFI's employment records. (*See* Pls.' Reply in Supp. of Mot. for Conditional Cert., Doc. 17, #213). Given the "modest burden" that applies at the initial stage of an FLSA act collective action, that is more than enough. *Bradenburg v. Cousin Vinny's Pizza, LLC*, No. 3:16-cv-516, 2017 WL 3500411, at *3 (S.D. Ohio Aug. 14, 2017) (noting the "modest burden" at the initial stage).

CFI's claims to the contrary are misplaced. CFI first argues that Plaintiffs lack any first-hand knowledge about the overtime situation for carpet installers who are

paid hourly, yet Plaintiffs nonetheless purportedly include within their class definition carpet installers who are paid on an hourly basis. (*See* Def.'s Resp. in Opp'n to Mot. for Conditional Cert., #177–79). CFI is correct that Plaintiffs' class definition does not differentiate between hourly and piece-rate workers. The definition merely calls for carpet installers "who worked over forty hours in any workweek beginning January 24, 2016 through the present and were not paid time and a half for the hours worked over forty." (*See* First Am. Compl., ¶ 43, #27). Both an hourly and piece-rate carpet installer fit that definition. But Plaintiffs are only required to show that their position is "similar, not identical, to the positions held by the putative class members." *Lewis*, 789 F. Supp. 2d at 867. Thus, "similarly situated class members under FLSA are those whose causes of action accrued in *approximately* the same manner as those of the named plaintiffs." *Id.* at 868 (emphasis added).

Here, while the proposed class definition is agnostic to the variance in compensation structures between hourly and piece-rate, if whichever compensation structure applies to a given installer does not provide enhanced pay for those who work over forty hours in a week, that installer would still be subject to the same allegedly unlawful policy of not receiving overtime pay. So long as Plaintiffs show that the harm arose from this uniform policy—a policy of not being paid overtime, no matter how calculated—they can be considered "similarly situated" for FLSA collective action purposes, despite being paid under somewhat different compensation frameworks. *See Lewis*, 789 F. Supp. 2d at 868 (finding the putative plaintiffs similarly situated and subject to a common policy of not receiving overtime even

though some members of the class were paid purely on commission, while others received salary plus commission).

Next, CFI focuses on the inclusion of the phrase "exempt employees" in the class definition set forth in the proposed Notice of Rights (Doc. 8-5), and suggests that this phrase creates "manageability" concerns for the class. (*See* Def.'s Resp. in Opp'n to Mot. for Conditional Cert., #179). Why that may be is not exactly clear from CFI's brief. CFI asserts that "Plaintiffs may not engage in speculation on the issue of whether CFI classified its carpet installers as 'exempt employees' under FLSA," (*id*.), but the case it cites on that point addresses the situation where a plaintiff is speculating regarding the existence of a uniform policy. Here, as noted above, Plaintiffs have provided sufficient non-speculative evidence on that front. In any event, concerns regarding the sufficiency of Plaintiffs' evidence are better suited for later proceedings; in particular, the decertification stage. To be sure, if all Plaintiffs are able to present at that point is speculation, that will be a problem. But that is a problem for another day.

Perhaps CFI's concern is that the class as defined in the Notice—with reference to "exempt employees"—would create a so-called "fail-safe" class. (*See* Def.'s Resp. in Opp'n to Mot. for Conditional Cert., #179). The term fail-safe class refers to "a class that cannot be defined until the case is resolved on the merits." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012). In other words, the class is defined so that it "includes *only* those who are *entitled* to relief." *Id.* (emphasis in original). As a general matter such classes are impermissible. *See id.* That is true for at least

23

two reasons. First, as a conceptual matter, they create a one-way ratchet in plaintiffs' favor. If the named plaintiffs prevail on the merits, the other class members benefit, as they are then included in the class. But, if the named plaintiffs lose, the absent class members are not bound, as they are then not included in the class. *Id*. Second, as a practical matter, fail-safe classes create workability issues, as the general rule in a class action is that the class determination occurs first, *before* a merits determination, not after that determination. *Id*.

If that is CFI's argument, though, it fails for two reasons. First, as noted above, Plaintiffs' actual class definition does not contain the "exempt employees" language. (*See* First Am. Compl., ¶ 43, #27). Second, and relatedly, defining the class to avoid the fail-safe problem "is more of an art than a science" and "often should be solved by refining the class definition rather than flatly denying class certification on that basis." *Feustel v. Careerstaff Unlimited, Inc.*, No. 1:14-cv-264, 2015-WL-13021897, at *2 (S.D. Ohio Mar. 25, 2015) (citing *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012)). Here, the Court chooses to avoid any potential concerns about the inclusion of the "exempt employees" language in Plaintiffs' Notice by accepting *Feustel*'s advice and "refining the class definition." *Id*. To that end, the Court **ORDERS** Plaintiffs to use the class definition set forth in their First Amended Complaint, which avoids any fail-safe concerns.

In sum, Plaintiffs provided enough evidence to show, under the "minimal burden" that applies here, that they are entitled to an Order conditionally certifying the class. For these reasons, the Court **GRANTS** Plaintiffs' Motion.

24

### C.    Opt-In Notice.

It appears that CFI does not contest the adequacy of Plaintiffs' opt-in notice. Notice must be "timely, accurate, and informative." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 172 (1989). Plaintiffs' proposed notice meets that standard. The Notice and Consent to Join form (Doc. 8-5), with the above-ordered amendment to the class definition language, adequately advises putative class members of the pending litigation, describes the legal and factual bases of the claims, informs putative members of their right to opt-in and that participating is voluntary, and provides instructions on how to opt-in.

### III.    <u>CONCLUSION</u>

For the above-stated reasons, the Court **ORDERS** the following:

The Court **DENIES** CFI's Motion to Dismiss (Doc. 10).

The Court **GRANTS** Plaintiff's Motion for Conditional Class Certification (Doc. 8), but **ORDERS** Plaintiffs to file a new Notice of Rights (Doc. 8-5) within **SEVEN (7) DAYS**, in which Plaintiffs delete the class definition language in the second paragraph of that Notice and instead insert the following: "This notice applies to all current and former Carpet Installers employed by Certified Flooring Installation, Inc., who worked over forty hours in any workweek beginning January 24, 2016 through the present and were not paid time and a half for the hours worked over forty."

The Court **CONDITIONALLY CERTIFIES** the FLSA class set forth above.

Within **FOURTEEN (14) DAYS** of the Plaintiffs filing their amended Notice of Rights with the Court, Defendants shall identify all putative class members by providing a list in electronic and importable format of the names, addresses, and (if known) email addresses of all current and former employees fitting the class description above.

The Court conditionally **APPROVES** Couch's proposed opt-in Notice (Doc. 8-5, #63–66), as amended to include the language set forth above, for distribution to the putative class members.

Within **FOURTEEN (14) DAYS** of receiving the putative class members' contact information from Defendants, Couch shall send the Notices, as amended, via U.S. mail and (if possible) email. The putative class members shall then have **SIXTY (60) DAYS** from the date that Couch sends the Notices to join this litigation.

      **SO ORDERED.**

February 14, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**