# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ANTHONY COUCH, et. al.,

        Plaintiffs,

              v.

CERTIFIED FLOORING
INSTALLATION, INC.,

        Defendant.

Case No. 1:19-cv-59
JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

This cause comes before the Court on Defendant Certified Flooring Installation, Inc.'s ("CFI") Motion for Summary Judgment (Doc. 61), filed on January 7, 2022. Plaintiffs Anthony Couch, Bradlee Belser, Tyler Hensley, Nicholas Muccillo, Hunter Crabtree, and Mark Julick[1] (collectively, "Plaintiffs") filed their Opposition (Doc. 70) on January 28, 2022. CFI filed a Reply (Doc. 77) on February 22, 2022.

Also before the Court is CFI's Motion to Strike (Doc. 76) Plaintiffs' Declarations (Docs. 68-1 to 68-6), which Plaintiffs filed in support of their Opposition to CFI's Motion for Summary Judgment. That matter has also been fully briefed (Docs. 79, 81).

For the reasons stated more fully below, the Court **GRANTS IN PART**, **DENIES IN PART**, and **DENIES AS MOOT IN PART** CFI's Motion to Strike (Doc.

---

[1] Couch, Belser, Hensley, and Muccillo are each named Plaintiffs in the Complaint. (Doc. 7). Crabtree and Julick opted in as Plaintiffs pursuant to the Court's February 14, 2020, Opinion and Order conditionally certifying the class. (Doc. 21).

76). Further, the Court **GRANTS IN PART** and **DENIES IN PART** CFI's Motion for Summary Judgment (Doc. 61).

## BACKGROUND

CFI is a carpet installation company that has been in business since 1985. (CFI Handbook, Doc. 54-4, #703). Approximately 95–98% of CFI's overall revenue comes from an arrangement CFI has with The Home Depot ("Home Depot"). (Pls. Resp. to Def. Proposed Undisputed Facts, Doc. 70-1, #4376 (admitting to ¶ 105 of Defs. Proposed Facts)). Under this arrangement, when customers purchase carpet from Home Depot, they are given the option to add installation services from CFI to their purchase. (*Id.* at #4366 (admitting to ¶ 1 of Defs. Proposed Facts)). The customers then pay Home Depot for the installation, and Home Depot—in turn—pays CFI to complete the customer's job. (Dehner Affidavit, Doc. 60-1, #3428). During the period giving rise to this action, Home Depot paid CFI $5.35 per square yard of carpet installed, $0.20 for take up and haul away of old carpet, $0.18 for moving furniture, and $45.00 if—for whatever reason—CFI's installers were unable to install the carpet once they arrived at the customer's home (an occurrence the parties refer to as a "busted job"). (*Id.*).

Each of the Plaintiffs worked for CFI as carpet installers at CFI's Hebron, Kentucky location. Couch began working in November 2016 and was terminated in January 2018.[2] (Couch Dep., Doc. 57, #1970, 2009). Belser started at CFI in a

---

[2] Neither CFI nor the Plaintiffs indicate in their briefs or their proposed undisputed facts when any of the Plaintiffs left their positions. Accordingly, the Court relies upon Plaintiffs' testimony in their depositions as to their end dates at CFI, with the caveat that some of these

different capacity, but became a carpet installer in approximately April 2017 and left the company in March 2018. (Belser Dep., Doc. 54, #538–39, 610). Hensley likewise was employed as a carpet installer between approximately April 2017 and January 2019. (Hensley Dep., Doc. 55, #976, 1028). Muccillo also worked at CFI as a carpet installer from April 2017 through February 2019. (Muccillo Dep., Doc. 58, #2645–47). Crabtree, meanwhile, started on or about July 28, 2017, (Crabtree Decl.[3], Doc. 68-3, #4283), and left CFI in winter 2019. (Crabtree Dep., Doc. 56, #1646–47). Julick also started on or about July 28, 2017, (Julick Decl., Doc. 68-5, #4293), and left in August 2019. (Julick Dep., Doc. 59, #3037). During the relevant period, Plaintiffs' supervisor was Jennifer Walker, who was the Facility Site Manager the Hebron location. (Walker Dep., Doc. 67, #3826–27).

Generally, each Plaintiff started the workday by arriving at CFI's facility in Hebron, Kentucky. (Dehner Dep., Doc. 65, #3605). There, Plaintiffs would load up their company vans with the materials they needed for the day. (*Id.*). At that time, each Plaintiff was also given an iPad, which contained their assigned installation jobs for the day. (Pls. Resp. to Def. Proposed Undisputed Facts, Doc. 70-1, #4368 (admitting to ¶ 19 of Def. Proposed Facts)). Plaintiffs would then drive to the customers' homes and complete their assigned installations. (*Id.*). If Plaintiffs

---

dates are somewhat vague. (*See, e.g.* Crabtree Dep., Doc. 56, #1646–47 (stating that he left CFI at some point in winter 2019)).

[3] Although CFI moves to strike Plaintiffs' Declarations, the Court has not identified any other document in the record revealing Crabtree or Julick's start dates. Accordingly, the Court relies on those declarations here for the narrow purpose of establishing that information. The Court notes, however, that Crabtree and Julick's exact start dates are not essential to its Opinion below.

finished their assigned jobs for the day early, CFI would sometimes have them assist other carpet installers with other ongoing carpet installations. (*See, e.g.* Hensley Dep., Doc. 55, #1063–65).

CFI used two separate systems to compensate Plaintiffs for their work as carpet installers. First, for portions of the relevant period, some of the Plaintiffs were paid on an hourly basis. Under this system, CFI promised to pay Plaintiffs a certain amount for every hour they worked, with an overtime premium if they worked more than forty hours a week. (*See, e.g.*, Couch Timecard, Doc. 67-10, #4238). Couch, for example, was paid on an hourly basis from November 2016 (when he started with CFI) until June 20, 2017. (Couch Pay Sheet, Doc. 57-11, #2353). (At that point CFI switched him to the other compensation scheme at issue here—compensation on a "per yard" basis—which is discussed in further detail below. (Summ. J. Opp'n, Doc 70, #4346).) Crabtree and Julick, for their part, were paid hourly from the time they started work in late July 2017 until approximately November 2017. (Crabtree Installer Agreement, Doc. 56-4, #1721; Julick Paysheet, Doc. 59-6, #3188). Finally, when Muccillo started as a carpet installer on about April 1, 2017, he was paid on a per yard basis (Muccillo Pay Sheet, Doc. 58-5, #2757)—but CFI switched him to hourly around April 16, 2017, (Muccillo Direct Deposit, Doc. 67-3, #4021), before switching him back to per yard on approximately August 20, 2017. (Muccillo Paysheet, Doc. 58-5, #2762).

During those periods when CFI did not pay Couch, Crabtree, Julick, and Muccillo on an hourly basis, CFI instead paid them for carpet installation services on

a "per yard" basis. Belser and Hensley, meanwhile, were paid per yard throughout their employment as carpet installers at CFI. (Summ. J. Opp'n, Doc. 70, #4346, 4347). The per yard system of compensation essentially paralleled the manner in which Home Depot paid CFI. That is, CFI paid each Plaintiff based on the tasks that Plaintiff accomplished. For example, between June 20, 2017, and August 15, 2017, CFI paid Couch $1.65 per square yard for installing carpet, $.05 per square yard for take up and haul away, and $.05 per square yard for moving furniture. (*See* Summ. J. Opp'n, Doc. 70, #4346 (citing Couch Pay Sheets, Doc. 57-11, #2353)). Different Plaintiffs, however, had slightly different rates, (*see, e.g.,* Crabtree Installer Agreement, Doc. 56-4, #1721 (stating that Crabtree's rate per yard installed was $1.50)), and CFI occasionally adjusted these rates during each Plaintiff's employment. (*See* Summ. J. Opp'n, Doc. 70, #4346 (citing Couch Pay Sheet, Doc. 57-11, #2353) (noting that CFI increased Couch's rates on August 15, 2017)).

Couch filed his initial Complaint in the instant case on January 24, 2019. (Doc. 1). In that Complaint, Couch alleged that, between January 24, 2016, and the present, CFI had failed to pay him and similarly situated employees time and a half in weeks where they worked more than forty hours. (*Id.* at #4). Couch further alleged that this violated the Fair Labor Standards Act's ("FLSA") overtime rules, as well as parallel overtime statutes under Ohio and Kentucky law. (*Id.* at #4–7). Couch then amended his Complaint on February 22, 2019—asserting identical claims, but adding Belser, Hensley, and Muccillo as named plaintiffs. (Am. Compl., Doc. 7).

On February 14, 2020, this Court issued an Opinion and Order (Doc. 21) denying CFI's Motion to Dismiss (Doc. 10), and granting Plaintiffs' Motion for Conditional Class Certification (Doc. 8). The Court defined the conditional class as "[a]ll current and former Carpet Installers employed by [CFI], who worked over forty hours in any workweek beginning January 24, 2016 through the present and were not paid time and a half for the hours worked over forty." (Doc. 21, #273). After receiving notice, Julick and Crabtree opted in to this action. (Notices of Filing of Opt-In Consent Forms, Docs. 28, 31).[4]

CFI filed the instant Motion for Summary Judgment on all Plaintiffs' claims on January 7, 2022. Plaintiffs filed their Opposition on January 28, 2022, and CFI filed a Reply on February 22, 2022. That same day, CFI also filed a Motion to Strike, asking that the Court disregard Plaintiffs' six Declarations in opposition to CFI's Motion for Summary Judgment. Plaintiffs oppose CFI's Motion to Strike, and the Court begins its analysis there.

## MOTION TO STRIKE

Plaintiffs filed six Declarations in Opposition to Summary Judgment—one for each of them. (Docs. 68-1 through 68-6). While the declarations are broadly similar in content, they are each tailored to the specific Plaintiff who filed them, and each covers a wide variety of subjects. These subjects include, but are not limited to, Plaintiffs' backgrounds, their daily schedules at CFI, how long it took to drive to their

---

[4] A seventh plaintiff, Kenneth Brady, also initially opted into the class on June 12, 2020. (Doc. 28). However, Brady voluntarily dismissed all claims against CFI on March 16, 2021. (Doc. 34).

first jobs of the day, and how they addressed situations where customers wanted to change job specifications. (*See, e.g.* Belser Decl., Doc. 68-1, #4273–76).

Because the Declarations cover a wide variety of subjects, CFI offers a wide variety of arguments in favor of striking each different factual assertion from the record. However, because the Court does not rely on all the factual assertions in Plaintiffs' Declarations in reaching its decision on CFI's Motion for Summary Judgment, many of CFI's arguments are effectively moot. Accordingly, the Court only addresses those portions of CFI's Motion to Strike related to the factual assertions in Plaintiffs' Declarations upon which the Court's decision below relies. Specifically, the Court considers CFI's Motion to Strike with regard to two categories of factual assertions in Plaintiffs' Declarations: (1) Plaintiffs' contentions that they never took lunch breaks, nor informed anyone in management that they were taking lunch breaks; and (2) Plaintiffs' contentions regarding their typical weekly schedules. The Court addresses each of these categories of information below.

## A.    Legal Standard

With regard to both categories of factual assertions, CFI's legal argument is essentially the same. CFI argues that these portions of Plaintiffs' Declarations "are inconsistent with [their] previously given sworn testimony," and should thus be stricken from the record. (Strike Reply, Doc. 81, #4482). Plaintiffs, for their part, counter that these portions of their Declarations are entirely consistent with their prior testimony. (Strike Opp'n, Doc 79, #4450).

7

As this Court has previously observed, "a party may not create a genuine issue of material fact by contradicting deposition testimony with a more recent affidavit."[5] *United States v. Atlas Lederer Co.*, 97 F. Supp. 2d 834, 838 (S.D. Ohio 2000). This rule serves an important procedural purpose, because "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984) (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)).

To implement this rule, the Sixth Circuit has instructed that "a district court deciding the admissibility of a post-deposition affidavit at the summary judgment stage must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir 2006). If the affidavit directly contradicts the affiant's deposition testimony, it "should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id.* However, if "there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit constitutes an attempt to create a sham fact issue." *Id.* (citation and internal quotation marks omitted). In determining whether the affidavit attempts to create a "sham fact issue," the Sixth

---

[5] Although this rule, by its terms, only applies to affidavits, courts have also applied it to declarations. *See, e.g., Holloway v. Kings Dodge, Inc.*, No. 1:16cv1075, 2018 WL 1794370, at *4 (S.D. Ohio Apr. 16, 2018).

Circuit has stated that "a useful starting point" is asking "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain." *Id.* at 908–09.

**B.     Couch And Crabtree's Assertions That They Never Took Breaks**

First, CFI moves to strike those portions of Plaintiffs' Declarations in which they contend that they neither took lunch breaks nor ever informed anyone in management that they were taking lunch breaks. For example, in his Declaration, Couch states that he

> worked continuously throughout the day without taking any breaks of 20 minutes or more throughout [his] workday. [He] never clocked out for lunch breaks or other breaks while [he] worked as a carpet installer, nor did [he] ever inform Ms. Walker that [he] took any type of break of more than 20 minutes during that same period. To the extent that CFI has any records indicating that [he] clocked out for a 30-minute break or otherwise took one while [he] worked as a carpet installer, those indications are not based upon [his] actions or information provided by [him].

(Doc. 68-2, #4280). Crabtree's Declaration contains essentially identical language. (Doc. 68-3, #4285).

CFI argues that the Court should strike these portions of Crabtree and Couch's Declarations, as these assertions contradict Crabtree and Couch's deposition testimony. The Court, however, is only partially persuaded.

First, CFI argues that Couch's deposition testimony contradicts the assertion in his Declaration that he never took a break longer than twenty minutes. (Strike

9

Mot., Doc. 76, #4415). Specifically, CFI notes that, during his deposition, Couch confirmed that he was once compensated $50 for "downtime," suggesting that there was a period of time, at least on that day, when he was not working. (*Id.*). There are a few problems with this argument, though. First, it is not entirely clear what Couch meant by "downtime," as he did not explain the term in his deposition, nor was he asked to do so. (Couch Dep., Doc. 57, #2096). In fairness to CFI, it could be that "downtime" refers to a bona fide break. However, it is also possible that Couch was, for example, on stand-by awaiting a new assignment, which is not considered a break under 29 C.F.R. § 785.15. Second, even if the "downtime" Couch described in his deposition was a bona fide break, his deposition does not indicate how long that downtime was—thus, Couch's deposition testimony does not directly contradict his Declaration's assertion that he never took a break longer than twenty minutes. (Couch Dep., Doc. 57, #2096). Accordingly, the Court **DENIES** CFI's Motion to Strike those portions of Couch's Declaration stating he never took breaks longer than twenty minutes.

CFI is more persuasive, however, in arguing that Crabtree's Declaration contradicts his deposition. (Strike Mot., Doc. 76, #4416). Indeed, at his deposition, although Crabtree initially stated that he and his colleagues "never took lunches," he then backtracked slightly and conceded that he took a half-hour lunch break "[m]aybe once in a blue moon." (Doc. 56, #1668). This contradicts Crabtree's Declaration, where he states that, as a carpet installer, he did not take "any breaks of 20 minutes or more throughout [his] workday." (Doc. 68-3, #4285). In fairness to Plaintiffs, however, this

10

contradiction strikes the Court as relatively minor. That said, out of an abundance of caution, the Court concludes it would be improper to credit the assertion in Crabtree's Declaration that he "never took lunches." Accordingly, the Court **GRANTS** CFI's Motion to Strike with regard to this portion of Crabtree's Declaration.

## C. Plaintiffs' Descriptions Of Their Typical Workday Schedules

In their Declarations, each of the Plaintiffs broadly describe their typical workday schedules. For example, in his Declaration, Julick states that

> [he] generally arrived at CFI's facility each morning from approximately 7:00 a.m., to 7:20 a.m., while [he] worked as a carpet installer. Once at the facility, [he] performed the preparatory work before going out into the field to complete the installations …. [He] typically left CFI's Hebron location from approximately 6:30 p.m., to 7:30 p.m. [He] worked Monday through Friday, along with certain Saturdays. [He] worked that schedule each week unless [he] took off work certain days that week.

(Doc. 68-5, #4296). The other Declarations contain broadly similar descriptions of Plaintiffs' workday schedules, albeit adapted to reflect the idiosyncrasies of their daily routines.

CFI argues that the Court should strike those portions of Belser, Couch, Crabtree, and Hensley's Declarations describing their typical workday schedules as contradicting their deposition testimony. The Court addresses CFI's arguments with regard to each of these Plaintiffs' Declarations below.

First, CFI argues that the Court should strike those portions of Belser's testimony describing when his workday would generally start and end. Specifically, CFI notes that, during his deposition, Belser stated that the end times of jobs could vary considerably, which CFI argues contradicts the Belser Declaration's statement

that Belser would typically leave work around 6:30 p.m. to 7:30 p.m. (Strike Mot., Doc. 76, #4413). As best as the Court can discern, CFI appears to be arguing that, because Belser's individual jobs did not generally end at a regular time, Belser cannot argue that he generally left work at a regular time. The Court is not persuaded, however, particularly given that both parties agree that CFI would assign Plaintiffs to assist on other carpet installers' jobs if they finished theirs early. (Strike Mot., Doc. 76, #4417; Strike Opp'n, Doc. 79, #4451). Thus, although it may have been hard for Belser to estimate when his *jobs* would generally end, he could still possibly estimate when his *workday* would generally end, since additional job assignments could effectively help "smooth over" any irregularities in Belser's daily schedule. Accordingly, the Court **DENIES** CFI's Motion to Strike as to the Belser Declaration's assertion that he would typically leave work at approximately 6:30 p.m. to 7:30 p.m.

With regard to Couch, CFI argues that the Court should strike that portion of his Declaration stating that he generally arrived at approximately 8:00 a.m. and left at approximately 7:00 p.m. Specifically, CFI argues that these assertions contradict text messages between Couch and Walker from three separate occasions indicating that Couch was late and would arrive at work around 9:00 a.m. (Strike Mot., Doc. 76, #4415 (citing Couch Text Messages, Doc. 57-9, #2307, 2308, 2311)). Given that Couch's Declaration states that he *generally* arrived at work around 8:00 a.m., however, CFI's argument here is unpersuasive. If anything, the fact that Couch was texting Walker when arriving at 9:00 a.m. *supports* his Declaration, since these texts

suggest that Couch typically arrived earlier, and that it would be out of the ordinary for him to arrive as late as 9:00 a.m.

CFI also highlights one text message Couch sent Walker on September 12, 2017, where Couch estimates that he worked 8:30 a.m. to 5:00 p.m. each day the previous week. Although this indicates that Couch arrived at work later and left work earlier than he stated was his general practice in his Declaration, identifying one isolated week where that was the case does not directly contradict Couch's assertion that, as a general matter, he arrived at work around 8:00 a.m. and left around 7:00 p.m. Accordingly, the Court **DENIES** CFI's Motion to Strike with regard to this portion of the Couch Declaration.

Next, CFI argues that the Court should strike that portion of the Crabtree Declaration stating Crabtree typically left work at 7:30 p.m. CFI argues that this statement contradicts Crabtree's deposition testimony where he allegedly said he would occasionally leave work at 2:00 p.m. Again, the Court is not persuaded. During Crabtree's deposition he was asked if "there were … days that [he] clocked out at about, you know, 2:00 or 3:00 and were done for the day?" (Doc. 56, #1663). Crabtree responded that "[y]ou've got your good days and got your bad days," and confirmed his schedule could "for the most part" vary from day to day. (*Id.*). Crabtree's answer here is admittedly vague, but Crabtree's general suggestion that his schedule could vary significantly is consistent with his Declaration's statement that he "typically" left work at "approximately" 7:30 p.m. Accordingly, the Court **DENIES** CFI's Motion to Strike with regard to this portion of Crabtree's Declaration.

13

Finally, CFI argues that the Court should strike that portion of Hensley's Declaration where he states that he would generally arrive "at approximately 7:00 a.m." (Doc. 68-4, #4291). As CFI argues, this assertion contradicts Hensley's deposition, where he states instead that he would "usually get [to work] between 7:00 and 7:30 in the morning." (Doc. 55, #983). While the contradiction between Hensley's deposition testimony and his Declaration strikes the Court as relatively minor, the Court agrees with CFI that this is, nonetheless, a contradiction. Thus, the Court concludes that it would be inappropriate to rely on this portion of Hensley's declaration in adjudicating CFI's Motion for Summary Judgment, and accordingly **GRANTS** CFI's Motion to strike it from the record, and will instead credit Hensley's testimony that he usually arrived at work between 7:00 and 7:30 in the morning.

## MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

CFI has also moved for summary judgment. In evaluating that motion, the Court bears in mind that "[t]he 'party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *See, e.g.*, *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

But the non-moving party cannot defeat a motion for summary judgment merely by pointing to any factual dispute. As the Sixth Circuit has explained, "[t]he

14

mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy, Mich.*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket and emphases omitted) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986)).

In sum, the nonmoving party, at this stage, must present some "sufficient disagreement" that would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

**B.    Law And Analysis**

CFI moves to dismiss Plaintiffs' FLSA overtime claims, as well as their overtime claims under Ohio and Kentucky's parallel overtime statutes. The Court addresses the FLSA claim first, before turning to Plaintiffs' state law claims.

In general, the FLSA requires "an employer to pay employees at least 150% of their hourly pay rate when they work more than 40 hours in a week." *Canaday v. Anthem Cos., Inc.*, 9 F.4th 392, 394 (6th Cir. 2021). Plaintiffs allege that CFI violated

this rule by failing to adequately pay them an overtime premium in connection with their work as carpet installers for CFI. The claims fall into two distinct categories.

First, a subset of Plaintiffs—Couch, Muccillo, Crabtree, and Julick (collectively the "Hourly Plaintiffs")—assert overtime claims against CFI related to the period in which they worked on an hourly basis ("the hourly claims"). Specifically, the Hourly Plaintiffs allege that CFI deducted thirty-minute lunchbreaks from their timesheets for weeks in which they recorded over forty hours, even though the Hourly Plaintiffs were not taking these breaks. Thus, CFI under-accounted for the Hourly Plaintiffs' working time, resulting in them not receiving overtime for hours over forty.

The second category of overtime claims, which all Plaintiffs advance, relate to the period in which CFI paid Plaintiffs on a per yard basis (the "per yard claims") for the carpet that Plaintiffs installed. On this front, Plaintiffs allege that, even though they were paid on a per yard basis, they were not exempt from the time-and-a-half requirement, and thus CFI was required to pay them at an enhanced rate whenever Plaintiffs worked more than forty hours per week installing carpeting.

In its Motion for Summary Judgment, CFI argues that both types of claims fail as a matter of law for multiple reasons, but those reasons differ somewhat depending on the category of claim. The Court thus addresses the two categories separately, starting with the hourly claims.

### 1.    **Plaintiffs' Hourly Claims**

First, Plaintiffs argue that Defendants are liable under the FLSA because they did not pay the Hourly Plaintiffs (Couch, Muccillo, Crabtree, and Julick) for all their

overtime during the period in which they worked on an hourly basis. (Summ. J. Opp'n, Doc. 70, #4350). More specifically, Plaintiffs allege that, in weeks where they worked more than forty hours, CFI deducted thirty-minute lunch breaks from each workday, even though "they did not take a half-hour break during that time, nor did they communicate that they took a half hour break to CFI." (Summ. J. Opp'n, Doc. 70, #4351). To the extent their timesheets indicate that they took lunch breaks, the Hourly Plaintiffs state in their Declarations that this is "not based upon [their] actions or information provided by [them]," as they "never clocked out for lunch breaks or other breaks while [they] worked as … carpet installer[s], nor did [they] ever inform Ms. Walker that [they] took any type of break of more than 20 minutes." (Couch Decl., Doc. 68-2, #4280; *see also* Crabtree Decl., Doc. 68-3, #4285; Julick Decl., Doc. 68-5, #4295; Muccillo Decl., Doc. 68-6, #4300). Thus, the Hourly Plaintiffs argue that, because CFI unilaterally deducted lunch breaks from their timesheets, even though the Hourly Plaintiffs did not clock out for or otherwise indicate they were taking that time off, they did not receive pay for all the hours they worked. (Summ. J. Opp'n, Doc. 70, #4350). And, because at least some of the missing time was time that otherwise would have been in excess of forty hours (as CFI apparently only deducted the thirty minutes per day in weeks in which the Hourly Plaintiffs worked over forty hours (*see id.* at #4350–51 (citing timecards for the Hourly Plaintiffs)), the Hourly Plaintiffs claim they should have received time-and-a-half for that excess time.

CFI offers three arguments in response. First, CFI argues that Plaintiffs are estopped from pursuing their hourly claims because they fall "outside of the certified class related to piece-rate compensation, outside of their complaint, and contrary to their sworn testimony." (Summ. J. Reply, Doc. 77, #4429). Second, CFI argues that plaintiffs have failed to present sufficient evidence that they worked the overtime hours they claim—specifically, that they worked through their lunch breaks when they were hourly employees. Third, CFI argues that, even if Plaintiffs were working through their lunch breaks, because CFI established a reasonable process for the Hourly Plaintiffs to report their overtime and the Hourly Plaintiffs failed to follow it, the Sixth Circuit's decision in *White v. Baptist Memorial Healthcare Corporation,* 699 F. 3d 869, 876 (6th Cir. 2012), bars them from pursuing the hourly claims now. The Court addresses each of these arguments in turn.

### a. Estoppel Does Not Preclude The Hourly Claims.

CFI first argues that, because Couch, Muccillo, Crabtree, and Julick failed to raise these claims earlier in this litigation, they cannot do so now. More specifically, Plaintiffs' litigation conduct precludes them from asserting these claims because, according to CFI, "Plaintiffs Couch, Muccillo, Crabtree and Julick are seeking relief [1] outside of the certified class related to piece-rate compensation, [2] outside of their complaint, and [3] contrary to their sworn testimony." (Summ. J. Reply, Doc. 77, #4429 (internal citations omitted)). To evaluate CFI's arguments on this front, then, the Court must separately review the definition of Plaintiffs' certified class, the scope of Plaintiffs' Amended Complaint, and Plaintiffs' prior sworn testimony.

18

Taking them in that order, the Court begins by rejecting CFI's claim that Plaintiffs are seeking relief outside the certified class. Plaintiffs' certified class includes "[a]ll current and former Carpet Installers employed by Defendant who worked over forty hours in any workweek beginning January 24, 2016 through the present and were not paid time and a half for the hours worked over forty." (Op., Doc. 21, #265–66). Nowhere does this class definition suggest it is limited only to class members whom CFI compensated on a per yard basis. Accordingly, the Court rejects CFI's contention that the hourly claims—which assert that a subset of Plaintiffs were not paid time and a half for hours over forty when CFI was paying on an hourly basis—fall outside Plaintiffs' certified class.

CFI's argument that Plaintiffs' hourly claims fall outside the scope of their Amended Complaint runs into a similar hurdle. (Summ. J. Reply, Doc. 77, #4429 (citing Am. Compl., Doc. 7, #25–26)). In particular, the Court cannot not identify any language in the Amended Complaint limiting the scope of Plaintiffs' claims only to the period in which they were paid on a per yard basis. Indeed, in support of its argument, CFI simply cites to pages #25 and #26 in the Complaint, without pointing to any of the specific language it believes is relevant. While those two pages explain how "[CFI] paid all Carpet Installers on a piece-rate [i.e. per yard] basis after they had worked a certain period of time for [CFI]," they do not state that Plaintiffs' claims are limited *only* to that latter period in which the carpet installers were compensated on a per yard basis. (Am. Compl., Doc. 7, #26). If anything, a review of the alleged dates gives rise to a contrary inference. Couch, for example, allegedly began working

19

at CFI in November 2016. (*Id.* at #23). CFI did not begin compensating Couch on a per yard basis, though, until "several months" later. (*Id.* at #25). Yet, the class period extends to any time "beginning January 24, 2016 through the present" in which carpet installers (presumably including Couch) "were not paid time and a half for the hours worked over forty." (*Id.* at #27). That would seem to include the months *before* CFI paid him on a per yard basis. Thus, the Court rejects CFI's argument Plaintiffs' hourly claims are beyond the scope of their Amended Complaint.

Finally, CFI argues that Plaintiffs are estopped from pursuing their hourly claims because such claims are "contrary to their sworn testimony." (Summ. J. Reply, Doc. 77, #4429). Specifically, CFI points to "Couch and Muccillo's Declarations[6] filed in support [of Plaintiffs'] Motion to Certify," which CFI argues "were limited to their employment time when they claim they were piece-rate, not hourly." (Summ. J. Reply, Doc. 77, #4430 (citing Couch Decl., Doc. 8-1, #51; Muccillo Decl., Doc. 8-4, #60– 61)).

Again, the Court is not persuaded, at least not by the record citations that CFI provides. For example, CFI cites to one page of Couch's Declaration in support of its argument. (*See id.* at #4430 (citing Couch Decl., Doc. 8-1, #51)). Nowhere on that page, though, does the Court find any language related to Couch's pay structure, or suggesting that the failure to pay overtime did not arise until CFI paid him on a per yard basis. Rather, that page merely describes Couch's background and provides an

---

[6] These Declarations (Docs. 8-1, 8-4) filed in support of Plaintiffs' Motion for Conditional Class Certification should not be confused with Plaintiffs' more recent Declarations (Docs. 68-2, 68-6) filed in Opposition to CFI's Motion for Summary Judgment.

overview of his responsibilities as a carpet installer. (Couch Decl., Doc. 8-1, #51). And, on the next page, Couch notes that he "typically worked 60 hours a workweek while [he] worked as a Carpet Installer at CFI," but "CFI never paid [him] premium pay for overtime hours." (*Id.* at #52). That doesn't sound like Couch is asserting that the failure arose only during the later per yard period.

CFI fares somewhat better—at least at first—with regard to Muccillo's Declaration. There, Muccillo states that "[w]hen [he] started, CFI informed [him] that [he] would make $1.25 for each square yard of carpet [he] installed. [He] also received $0.05 for each square foot of carpet removed. Approximately one to two months thereafter, CFI begin paying [him] $1.50 for each square yard of carpet [he] installed." (Doc. 8-4, #61). Thus, Muccillo's Declaration suggests that he never worked on an hourly basis while employed at CFI. In that sense, the Declaration contradicts Plaintiffs' more recent factual assertions in their Opposition to CFI's Motion for Summary Judgment. In their briefing, Plaintiffs state that, after Muccillo finished his training around April 1, 2017, "CFI began paying [him] … piece-rate amounts for installing carpet …. On or about April 16, 2017, CFI changed Muccillo's pay to $11.00 per hour. CFI changed Muccillo's pay back to a piece-rate basis on or about [August 20, 2017]." (Doc. 70, #4348 (internal citations omitted)). Consequently, while Muccillo's original Declaration suggested that he was always paid on a per yard basis, Plaintiffs now appear to have pivoted, and argue instead that Muccillo was, at various times, paid both on an hourly basis as well as per yard.

Admittedly, this could give rise to judicial estoppel concerns. "The doctrine of judicial estoppel 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *White v. Wyndham Vacation Ownership, Inc*., 617 F.3d 472, 476 (6th Cir. 2010) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). "Judicial estoppel … does not usually apply to shifting legal arguments; it typically applies to shifting factual arguments." *Law Office of John H. Eggertsen P.C. v. Comm'r of Internal Revenue*, 800 F.3d 758, 766 (6th Cir. 2015). As the Sixth Circuit has explained, the doctrine's purpose is "to preserve the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship." *Wyndham Vacation,* 617 F.3d at 476 (quoting *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002)) (internal quotation marks omitted).

"The Supreme Court has provided three factors to assess whether judicial estoppel should be applied in a particular case: (1) whether the party's current position is 'clearly inconsistent' with its previous one; (2) whether the earlier court actually accepted the party's position; and (3) whether the party against whom judicial estoppel is invoked would 'derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Grise v. Allen*, 714 F. App'x 489, 495 (6th Cir. 2017) (quoting *New Hampshire*, 532 U.S. at 750–51). The Sixth Circuit has instructed, however, that judicial estoppel "should be applied with caution to 'avoid impinging on the truth-seeking function of the court, because the doctrine precludes a contradictory position without examining the truth of either statement.'"

22

*In re B&P Baird Holdings, Inc.,* 759 F. App'x 468, 478 (6th Cir. 2019) (quoting *Eubanks v. CBSK Fin. Grp., Inc.*, 385 F.3d 894, 897 (6th Cir. 2004)); *see also Eckstein v. Cincinnati Ins. Co.*, 469 F. Supp. 2d 444, 451–52 (W.D. Ky. 2007) ("Judicial estoppel is an extraordinary remedy to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice. It is not meant to be a technical defense for litigants seeking to derail potentially meritorious claims …." (internal quotation marks and citations omitted)).

The problem for CFI is that, while it has established something of a contradiction between Muccillo's Declaration and Plaintiffs' more recent factual assertions, that showing only satisfies the first *New Hampshire* factor. But CFI makes no effort to meet the second and third *New Hampshire* factors. For example, CFI points to nowhere in the record where the Court accepted Muccillo's assertion that he was paid only on a per yard basis. Likewise, CFI has not shown that Plaintiffs would derive an unfair advantage or impose an unfair detriment on CFI if not estopped.

To the extent CFI is tacitly inviting the Court to fill in these gaps on its behalf, the Court declines. As the Sixth Circuit has explained, "district courts are not advocates. Nothing requires courts to scour the record for evidence that retroactively supports arguments the parties previously made." *Parker v. Winwood*, 938 F.3d 833, 839 (6th Cir. 2019); *see also United States v. Robinson,* 390 F.3d 853, 886 (6th Cir. 2004) (observing that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived"). Accordingly, the

Court finds that Couch's and Muccillo's previous Declarations do not estop Plaintiffs from pursuing their hourly claims.

> **b.    There Is A Genuine Dispute As To Whether The Hourly Plaintiffs Worked Through Their Lunchbreaks.**

Next, CFI argues that, even if Plaintiffs can pursue the hourly claims, the claims fail on the record here, as the Hourly Plaintiffs have not shown that they worked any overtime for which they were not paid. In support, CFI points to Plaintiffs' timesheets, which CFI argues show that Plaintiffs were appropriately compensated whenever they worked more than forty hours a week. (Summ. J. Reply, Doc. 77, #4431–32). The Hourly Plaintiffs counter that the timesheets are not accurate, because they include deductions for lunchbreaks that Plaintiffs claim they never took. (Summ. J. Opp'n, Doc. 70, #4351–52).

 "It is an employee's burden to 'prove, by a preponderance of the evidence, that he performed work for which he was not properly compensated.'" *Hunt v. Monro Muffler Brake, Inc.*, 769 F. App'x 253, 259 (6th Cir. 2019) (quoting *Moran v. Al Basit LLC*, 788 F.3d 201, 205 (6th Cir. 2015)). Where an employee disputes the accuracy of an employer's timekeeping records, he "may carry his burden by 'producing sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Id.* (quoting *Anderson,* 328 U.S. at 687 (1946)) (modifications omitted).

Here, CFI has presented timesheets showing that the Hourly Plaintiffs were taking their lunchbreaks. (*See, e.g.,* Julick Time Card Report, Doc. 67-7). Not only that, but CFI also argues that any lunchbreaks reflected in the timesheets reflect

information that Plaintiffs themselves fed to CFI. Specifically, CFI argues that Couch, Muccillo, Crabtree, and Julick "clocked in and out on their own for lunch most of the time." (Summ. J. Reply, Doc. 77, #4434–35). In those instances where the Hourly Plaintiffs did not record their own lunches (by clocking in and out), CFI states that Walker "would verify all hours with the plaintiffs verbally," and only deduct lunch breaks from the time records "if verified with Plaintiffs that they took a lunch break." (*Id.*).[7] Thus, CFI maintains, because the Hourly Plaintiffs' timesheets accurately reflect that they were paid for all their overtime, the hourly claims must fail.

Because CFI has offered into the record timesheets showing that plaintiffs were adequately compensated for all their overtime, the burden shifts to the Hourly Plaintiffs to "produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Hunt*, 769 F. App'x at 259. Here, the Hourly Plaintiffs attempt to meet that burden by relying entirely on their own testimonial evidence, where they state that they neither took lunch breaks nor informed Walker that they were doing so. (Couch Decl., Doc. 68-2, #4280; *see also* Crabtree Decl., Doc. 68-3, #4285; Julick Decl., Doc. 68-5, #4295; Muccillo Decl., Doc. 68-6, #4300).

---

[7] Somewhat confusingly, in the same paragraph where CFI avers that Walker only adjusted time records if she verbally confirmed that the Plaintiffs took lunch breaks, CFI also states "CFI did not go into the system and deduct lunches; [the Hourly Plaintiffs] were clocking in and out for those lunches." (Summ. J. Reply, Doc. 77, #4435). This suggests that *all* lunch breaks in the timesheets were recorded by the Hourly Plaintiffs themselves, and that Walker *never* manually adjusted any time records. In other words, CFI simultaneously asserts in a single paragraph that Walker did, and did not, adjust at least some time records.

The question confronting the Court, then, is whether the Hourly Plaintiffs' own self-serving testimony about the hours they worked suffices to defeat CFI's Motion for Summary Judgment. The Sixth Circuit has answered that question "yes." *See Moran v. Al Basit LLC*, 788 F.3d 201, 205 (6th Cir. 2015). In *Moran*, a mechanic brought an overtime claim against his employers, who owned and operated the repair shop where he worked. *Id.* at 202. The defendants moved for summary judgment, pointing to timesheets showing that the plaintiff had not worked any uncompensated overtime. *Id.* at 205. The plaintiff responded that the time sheets were inaccurate, and went on to testify that "he worked an average of sixty-five to sixty-eight hours per week for the duration of his employment." *Id.* at 202. Specifically, the plaintiff testified that he was "required to be at work every weekday at 7:30 AM, half an hour before the shop opened. He then … was typically at work until 6:30 PM or 7:00 PM on weekdays. [The plaintiff] stated that it was also not unusual for him to be there at 8:00 at night." *Id.* at 203 (internal citations and modifications omitted). Additionally, the plaintiff also testified that he worked Saturdays from 7:30 AM until 4:30 or 5:00 PM, as well as some Sundays. *Id.*

The Sixth Circuit concluded that the plaintiff's testimony was "sufficient to defeat [the d]efendant's motion for summary judgment." *Id.* at 205. While conceding the plaintiff's testimony "lack[ed] precision," the Sixth Circuit nonetheless found that the plaintiff had

> coherently describe[d] his weekly work schedule, including typical daily start and end times which he used to estimate a standard work week of sixty-five to sixty-eight hours …. [W]e do not require employees to recall their schedules with perfect accuracy in order to survive a motion for

26

summary judgment. It is unsurprising, and in fact expected, that an employee would have difficulty recalling the exact hour he left work on a specific day months or years ago.

*Id.*

That said, the Sixth Circuit's observation that plaintiffs are not required to "recall their schedules with *perfect* accuracy" should not be misinterpreted to suggest *any* generalized statement about any employee's work schedule will suffice. *Id.* "[C]onclusory allegations about an employee's work schedule [are] insufficient under [Federal Rule of Civil Procedure] 56." *Viet v. Le*, 951 F.3d 818, 824 (6th Cir. 2020) (citations omitted). In *Viet*, the Sixth Circuit cited the Eighth Circuit's decision in *Holaway v. Stratasys, Inc.*, 771 F.3d 1057 (8th Cir. 2014), as "the best example" of a case where an employee's testimonial description of his overtime work was too conclusory to survive summary judgment on his FLSA claim. *Viet*, 951 F.3d at 824. There, the plaintiff worked as a field service engineer for a technology company. *Id.* (citing *Holaway*, 771 F.3d at 1058). In describing his work, the plaintiff

> estimated that he typically worked 60 to 70 hours per week, but provided few details showing that his tasks required more than 40 hours per week. He said that he would spend "two to three hours doing preparation work" before heading to any jobs and "three to four hours traveling to locations." He also mentioned several after-hours weekly activities, including preparing expense reports. The Eighth Circuit found that this testimony was too conclusory under Rule 56. Holaway 'failed to put forward any evidence of the amount and extent of his work in excess of forty hours a week for any week worked for [the company], let alone evidence of excess hours worked every week of his employment.' His general testimony about his average hours also did not suffice to create a jury question because he did not support it with a 'meaningful explanation of how he arrived at his final estimate of sixty hours a week, every week, of his employment.'

*Id.* at 824 (quoting *Holaway*, 771 F.3d at 1058–60).

Much as in *Viet*, then, the question here is "where does [the Hourly Plaintiffs'] case fall? Is it more like the Eighth Circuit's decision in *Holaway* than [the Sixth Circuit's] decisions in *Moran* …?" *Id.* In the Court's view, the Hourly Plaintiffs' case is closer to the latter. In fact, in some ways, Plaintiffs' testimony is more "precis[e]" and "coherent" than the workday schedule descriptions the Sixth Circuit found sufficient in *Moran. Moran,* 788 F.3d at 205. Here, the Hourly Plaintiffs do not describe typical start and end times that varied day to day, or workweeks whose duration varied from week to week. Rather, the Hourly Plaintiffs' testimony is straightforward and coherent: they state that they never took a lunch break, and that any timesheets indicating they did so are incorrect. (Couch Decl., Doc. 68-2, #4280; Julick Decl., Doc. 68-5, #4295; Muccillo Decl., Doc. 68-6, #4300).[8] Of course, "[w]hether [this] testimony is credible is a separate consideration," but that question "is inappropriate to resolve at the summary judgment stage." *Moran,* 788 F.3d at 205. For the purposes of surviving CFI's Motion for Summary Judgment, the Hourly Plaintiffs' testimony suffices.

### c. CFI Is Not Entitled To Summary Judgment On The Hourly Claims Under *White.*

Even if Plaintiffs can rely on their testimony to show that they worked through their lunchbreaks, CFI argues that the issue is moot because the Sixth Circuit's decision in *White*, 699 F.3d 869, shields CFI from liability.

---

[8] In fairness to CFI, Crabtree admitted during his deposition that he took a lunch break "[m]aybe once in a blue moon." (Doc. 56, #1668). While Crabtree's testimony is thus slightly less "precis[e]" and "coherent" than that of his colleagues, who state that they *never* took lunch breaks, the Court finds Crabtree's testimony is nonetheless sufficient to create a genuine dispute under *Moran.*

28

CFI's argument on this front is somewhat cryptic. CFI's Reply in Support of its Motion for Summary Judgment simply states, "[a]s a preliminary matter, an automatic meal deduction system is lawful under the FLSA." (Doc. 77, #4434 (citing *White*, 699 F.3d at 873)). CFI's brief, however, does not offer further explanation as to how it believes *White* might apply to the hourly claims. And, in the Court's view, it does not.

In fairness to CFI, it gets the rule from *White* right. There, the Sixth Circuit observed that "[a]n *automatic* meal deduction system is lawful under the FLSA." *White*, 699 F.3d at 873 (emphasis added). The Court struggles, though, to discern how that rule applies in the instant matter, given that CFI argues that none of the lunch breaks at issue were deducted automatically. As CFI states: "[a]ny lunch breaks were verified or it wasn't taken …. Ms. Walker is not aware of any automatic deduction for a lunch break, the deduction would only occur if verified with Plaintiffs that they took the lunch break." (Summ. J. Reply, Doc. 77, #4434). Thus, although *White* recognizes that employers may create a system where, by default, an employees' lunch breaks are automatically deducted, CFI indicates that none of the lunch breaks were automatically deducted in this case.

That distinction is important. *White*'s rule allowing automatic lunch deductions is a logical extension of that case's broader holding that "[u]nder the FLSA, if an employer establishes a reasonable process for an employee to report uncompensated work time[,] the employer is not liable for non-payment if the employee fails to follow the established process." *White,* 699 F.3d at 876. The theory

underpinning that rule is relatively straightforward: if an employer creates a system that provides employees an avenue to report overtime, then—in general—the employee cannot simply fail to do so and yet sue for unpaid overtime under the FLSA. Applying that rule to lunch breaks specifically, it means an employer is allowed to create a system in which lunch breaks are deducted from timesheets automatically, thus shifting to the employee the responsibility to record when those lunch breaks are *not* taken—for example, by requiring the employee to fill out overtime paperwork when he or she works through lunch. *Id.* at 876–77.

But that is not the system CFI created here. Rather, CFI maintains that its timekeeping process, by default, assumed employees did *not* take their lunch breaks, and timesheets only reflected lunch breaks that the employees affirmatively indicated they took—either by clocking in and out themselves, or by verifying with Walker after the fact that they had taken a lunch break. (Summ. J. Reply, Doc. 77, #4434–35). The Hourly Plaintiffs maintain that they followed this system and never reported that they took any lunch breaks, whether by clocking in and out, or reporting to Walker.[9] (Couch Decl., Doc. 68-2, #4280; *see also* Julick Decl., Doc. 68-5, #4295; Muccillo Decl., Doc. 68-6, #4300). Because the Hourly Plaintiffs maintain that they followed CFI's stated timekeeping procedures, but that the timesheets (for whatever reason) do not reflect all the hours they worked, *White* does not shield CFI from overtime liability here. Rather, to adjudicate this matter, the Court would be required

---

[9] Again, in fairness to CFI, it is more accurate to say that Crabtree *almost* never took lunch breaks (and presumably, almost never clocked out for a lunch break or informed Walker he was taking a lunchbreak). (Crabtree Dep., Doc. 56, #1668).

to evaluate the credibility of Plaintiffs' testimony, which is a task ill-suited for resolution on summary judgment.

In short, the Court finds that the Hourly Plaintiffs are entitled to pursue the hourly claims, and that those claims do not fail as a matter of law on the record here.

### 2. Plaintiffs' Per Yard Claims

In addition to the hourly claims, Plaintiffs also assert overtime claims related to the periods during which they worked on a per yard basis. According to Plaintiffs, during this period, they each regularly worked over forty hours per week. Specifically, Plaintiffs describe their general Monday through Friday schedules as follows:

- Belser: generally arrived between 7:30 and 8:00 a.m. and left at approximately 7:00 p.m. (Belser Decl., Doc. 68-1, #4275–76).

- Couch: generally arrived at approximately 8:00 a.m. and left at approximately 7:00 p.m. (Couch Decl., Doc. 68-2, #4280–81).

- Crabtree: generally arrived at approximately 8:00 a.m. and left at approximately 7:30 p.m. (Crabtree Decl., Doc. 68-3, #4285–86).

- Hensley: generally arrived at approximately 7:00 a.m. to 7:30 a.m. and left at approximately 7:00 p.m. (Hensley Dep., Doc 55, #983; Hensley Decl., Doc. 68-4, #4291).[10]

- Julick: generally arrived between 7:00 a.m. and 7:20 a.m and generally left between 6:30 p.m. and 7:30 p.m. (Julick Decl., Doc. 68-5, #4296).

- Muccillo: generally arrived at approximately 6:30 a.m. and left between 5:00 and 6:00 p.m. (Muccillo Decl., Doc. 68-6, #4300–01).

---

[10] As described above, the Court disregards the contention in Hensley's Declaration that he typically arrived at approximately 7:00 a.m. (Hensley Decl., Doc 68-4, #4291). Instead, the Court relies on Hensley's statement in his deposition that he would "usually get [to work] between 7:00 and 7:30 in the morning." (Doc. 55, #983).

In addition to working Monday through Friday, Plaintiffs also state that they worked "certain Saturdays." (Doc. 68-1, #4276; Doc. 68-2, #4281; Doc. 68-3, #4286; Doc. 68-4, #4291; Doc. 68-5, #4296; Doc. 68-6, #4301). These assertions, if true, would mean that Plaintiffs typically worked well over forty hours each week, and are thus entitled to overtime, at least to the extent that overtime is owed when employees are compensated on a per yard basis. (Summ. J. Opp'n, Doc. 70, #4352).

CFI nonetheless argues that the Court should reject Plaintiffs' per yard claims for three reasons. First, CFI argues that Plaintiffs have failed to create a genuine dispute as to whether they actually worked more than forty hours a week. Second, CFI argues that, even if Plaintiffs worked more than forty hours a week, *White* shields CFI from liability. Third, CFI argues that, even if Plaintiffs worked more than forty hours a week, and *White* does not shield CFI, Plaintiffs were FLSA-exempt employees when they worked on a per yard basis, and thus were not entitled to overtime. The Court addresses each of these arguments below.

### a. There Is A Genuine Dispute As To Whether Plaintiffs Worked Overtime.

First, CFI argues that it is not liable because Plaintiffs have failed to create a genuine dispute that they worked more than forty hours a week. As CFI argues, "Plaintiffs' Complaint alleged they worked between 55 and 60 hours per week. But they have no evidence to prove they worked the hours claimed or even close, since many weeks they worked less than 30 hours." (Summ. J. Mot., Doc. 61, #3483 (internal citations omitted)). In support, CFI relies on Plaintiffs' timesheets, which

CFI argues conclusively demonstrate that Plaintiffs never worked overtime. (*Id.* (citing Plaintiffs' Pay Rate Calculation Tables, Docs. 60-4 to 60-9)).

As previously explained, "[i]t is an employee's burden to 'prove, by a preponderance of the evidence, that he performed work for which he was not properly compensated.'" *Hunt,* 769 F. App'x at 259 (quoting *Moran,* 788 F.3d at 205). Accordingly, where an employee disputes the accuracy of an employer's timekeeping records, he "may carry his burden by 'producing sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Id.* (quoting *Anderson,* 328 U.S. at 687) (modifications omitted).

In this case, CFI has produced timesheets indicating that Plaintiffs were working less than forty hours a week during the period in which they were paid per yard. (*See* Plaintiffs' Pay Rate Calculation Tables, Docs. 60-4 to 60-9). Plaintiffs, in response, once again argue that the timesheets are inaccurate. (Summ. J. Opp'n, Doc. 70, #4352). In support of that argument, Plaintiffs again point to testimony in their Declarations and depositions indicating that, in a typical week, they worked well over forty hours. The question, then, is whether Plaintiffs' testimony is sufficient, in light of the timesheets, to create a sufficiently genuine dispute to survive CFI's Motion for Summary Judgment.

For much the same reasons set forth above, the Court concludes that, under the Sixth Circuit's decisions in *Moran*, 788 F.3d 201, and *Viet*, 951 F.3d 818, Plaintiffs' testimony suffices to create a genuine dispute. Indeed, much like the plaintiff in *Moran,* each employee here has provided estimates of when their workdays generally

33

started and ended and also outlined their daily schedules. For example, in his declaration, Crabtree states that he

> generally arrived at CFI's facility each morning at approximately 8:00 a.m., while [he] worked as a carpet installer. Once at the facility, [he] performed the preparatory work before going out into the field to complete the installations …. [He] typically left CFI's Hebron location at approximately 7:30 p.m. [He] worked Monday through Friday, along with certain Saturdays. [He] worked that schedule each week unless [he] took off work certain days that week.

(Doc. 68-3, #4285–86). The other Plaintiffs' descriptions are broadly similar. While acknowledging that these descriptions are somewhat vague, the Court finds them no more so than the testimonial description provided the plaintiff provided in *Moran*. Accordingly, the Court finds Plaintiffs have demonstrated a genuine dispute of material fact as to whether they worked more than forty hours a week when they were employed on a per yard basis.

### b. *White* Does Not Entitle CFI To Summary Judgment On The Per Yard Claims.

Next, CFI argues that, even if Plaintiffs can produce sufficient evidence to create a genuine dispute as to whether they worked more than forty hours, their claims are barred under the Sixth Circuit's decision in *White*, 699 F.3d 869. As CFI states, "[u]nder the FLSA, if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process." (Summ. J. Mot., Doc, Doc. 61, #3484 (citing *White*, 699 F.3d at 876)). Thus, CFI argues, because it "established written policies governing time keeping procedures for non-exempt

34

employees requiring them to use the timekeeping system[] [and] to record their time accurately," CFI is not liable for Plaintiffs' per yard claims. (*Id.* at #3483).

The Court does not agree. As noted above, CFI is correct that, under *White,* generally "if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process." 699 F.3d at 876. But the Court finds *White* does not shield CFI from Plaintiffs' per yard claims for two reasons. First, for at least a portion of the period in which Plaintiffs worked on a per yard basis, it is not clear that CFI actually had a timekeeping policy in place that applied to the Plaintiffs. Second, even when a timekeeping policy was in place, it remains unclear whether CFI was nonetheless on notice that Plaintiffs were working overtime, despite what the timekeeping system may have said. The Court expands on each of these below.

First, *White* cannot completely shield CFI from liability because, for at least a portion of the time when Plaintiffs worked on a per yard basis, it is not clear that CFI had any timekeeping procedures in place that applied to them. Indeed, multiple Plaintiffs stated during their depositions that, after they started working on a per yard basis, they were under the impression that they were no longer required to clock in and out at the start and endpoints of their workdays. For example, Belser testified that Paycor—CFI's timekeeping software—was the mechanism he would use to clock in and out. (Doc. 54, #557). But Belser went on to explain that he and the other installers "only used Paycor at the very beginning of employment and towards the very end of employment." (*Id.*). This is because, Belser explained, he and the other

35

installers "were told to quit using it during the carpet class,[11] and then a couple of months before the end of employment [they were] asked to use it again." (*Id.* at #557–58). Couch similarly testified that, although he "clocked in when [he] first started [at CFI]," "[w]hen they moved [him] to … per-piece basis, there was no clocking in or out. [He] worked until the job was done." Couch Dep., Doc. 57, #2127. Likewise, when Muccillo was asked at his deposition whether he clocked in and out when he worked as an installer, he responded, "[n]o, not all the time. They started that … halfway through it …." (Doc. 58, #2664).

Despite this testimony, CFI argues that there can be no genuine dispute that Plaintiffs were required to record their time. Specifically, CFI notes that it "established written policies governing time keeping procedures for non-exempt employees requiring them to use the timekeeping system" and to "record their time accurately." (Summ. J. Mot., Doc. 61, #3483). CFI's argument, though, misses the mark. Plaintiffs do not deny that these policies existed with regard to *nonexempt* employees. Rather, Plaintiffs argue that they thought these policies did not apply to them specifically because CFI had told them they were *exempt* employees. Accordingly, the Court rejects CFI's reliance on policies expressly directed at nonexempt employees as a basis for obtaining summary judgment here.

---

[11] The "carpet class" was "a 5-week Flooring Training Program to provide some employees with the opportunity to … obtain a certification for Carpet Residential I according to the Certification Standards of the International Certified Flooring Installers Association." (Pls. Resp. to Def. Proposed Undisputed Facts, Doc. 70-1, #4367 (admitting to ¶ 5 in CFI's Proposed Undisputed Facts). All of the Plaintiffs except Couch participated in that program, (*id.* (admitting to ¶ 7 in CFI's Proposed Undisputed Facts)). After each of these Plaintiffs completed the program, they began working on a per yard basis. (*id.* (admitting to ¶ 10 in CFI's Proposed Undisputed Facts)).

CFI is not entitled to summary judgment on Plaintiffs' per yard claims under *White* for another reason. As the Sixth Circuit explained in *Craig v. Bridges Brothers Trucking LLC,* "*White* carves out two exceptions to [its general rule], finding that employers who prevent the employees from reporting overtime *or are otherwise notified of the employees' unreported work* are still on the hook for unpaid overtime." 823 F.3d 382, 389 (6th Cir. 2016) (emphasis added, internal quotation marks and modifications omitted).

Here, Plaintiffs do not allege that CFI "prevent[ed] [them] from reporting [their] overtime." *Id.* But, even assuming that CFI had established timekeeping policies with regard to per yard workers, there is record evidence that would support a conclusion that CFI was on notice that Plaintiffs were working (unreported) overtime. Indeed, Plaintiffs argue that CFI's "Field Employee Expectations" required Plaintiffs to check in with Walker or Brandon Atkins[12] before they left at the end of the workday. (*See, e.g.* B. Belser Field Employee Expectations, Doc. 54-11, #755; T. Hensley Field Employee Expectations, Doc. 55-15, #1174; H. Crabtree Field Employee Expectations, Doc. 56-11, #1861; M. Julick Field Employee Expectations, Doc. 59-10, #3306). Thus, Plaintiffs argue that Walker "should have been aware that Plaintiffs often arrived after she had already left because Plaintiffs had not yet checked in or returned CFI's van." (Summ. J. Opp'n, Doc. 70, #4355). To be sure, this conflicts with Walker's deposition testimony, where she stated that Plaintiffs "were not required to check in at the end of the day." (Walker Dep., Doc. 67, #3871). But

---

[12] Adkins was the Operations Manager at CFI's Hebron location during the relevant period. (Walker Dep., Doc. 67, #3827).

resolving such conflicts is the province of the jury. On the current record, there is a genuine dispute as to whether Walker would have been on notice that Plaintiffs were working longer hours than their timesheets suggested.

### c.   It Is Unclear If Plaintiffs Were Exempt Employees.

Even if there remains a genuine dispute as to, first, whether Plaintiffs worked more than forty hours a week, and second, whether *White* shields CFI from liability, CFI argues that summary judgment nonetheless is appropriate because Plaintiffs were overtime exempt employees when they worked on a per yard basis. (Summ. J. Mot., Doc. 61, #3475). Specifically, CFI argues that, during this period, Plaintiffs were exempt from the FLSA's overtime requirements under 29 U.S.C. § 207(i) as commission-earning employees of a retail or service establishment. (*Id.*).

Section 207(i) creates an exemption from the FLSA's overtime rules for certain commission-earning employees. To qualify for this exemption, the employee must meet three requirements: "(1) the employee must work in a 'retail or service establishment;' (2) the employee must be paid a regular rate of more than one and a half times the federal minimum wage; and (3) the employee must receive more than half of his compensation in the form of commissions earned from the sale of goods or services." *Hanna v. Marriott Hotel Servs.,* No. 3:18-cv-0325, 2019 WL 7482143, at *2 (W.D. Tenn. Feb. 5, 2019). Importantly, the Sixth Circuit has held that § 207(i) is an "affirmative defense[] on which the employer has the burden of proof." *Wilks v. Pep Boys,* 278 F. App'x 488, 489 (6th Cir. 2008). Further, the commission-earning exemption is "narrowly construed against the employers seeking to assert [it]." *Id.*

Here, Plaintiffs do not dispute that they worked in a "retail or service establishment" when CFI employed them on a per yard basis. (*See* Summ. J. Opp'n, Doc. 70, #4356). Thus, the only two questions are (1) whether Plaintiffs received more than one half of their compensation in the form of commissions earned from the sale of goods or services, and (2) whether they were paid a regular rate of more than one and a half times the federal minimum wage. The Court addresses each of these questions in succession.

### i.    Plaintiffs Received Commissions.

First, CFI must show that plaintiffs received more than one half of their compensation in the form of commissions earned from the sale of goods or services. *Hanna*, 2019 WL 7482143, at *2. To see whether that condition is met here, the Court must answer two questions. First, what types of payments made up a majority of the Plaintiffs' compensation during the relevant period? Second, is that type of payment properly considered a "commission"?

Here, the parties do not appear to dispute that (after the initial hourly rate period described above) the Plaintiffs earned virtually all of their pay on a per square yard basis as carpet installers, with certain additional payments for moving furniture and for the occasional "busted" job. (Summ. J. Mot., Doc. 61, #3467; Summ. J. Opp'n, Doc. 70, #4357). Accordingly, the only question facing the Court is whether such payments are properly considered "commissions."

"Neither the FLSA nor its implementing regulations define the term 'commission.'" *Osterman v. Gen. R.V. Ctr., Inc.*, No. 19-10698, 2020 WL 6708873, at

*4 (E.D. Mich. Nov. 16, 2020) (citing *Wilks v. Pep Boys*, 278 F. App'x. 488, 489 (6th Cir. 2008)). As at least one court has noted, this is a "regrettabl[e]" oversight, given the important implications that arise under the Act where an employee is paid in commissions. *Tom v. Hospitality Ventures*, 980 F.3d 1027, 1034 (4th Cir. 2020) ("Regrettably, neither the FLSA nor its regulations define a 'commission.'").

Nor frankly does case law provide a lot of assistance. The Third Circuit observed in a 2010 decision that "[d]ecisions on the meaning of 'commission' under the retail commission exception are, in fact, sparse." *Parker v. NurtriSystem, Inc.*, 620 F.3d 274, 281 (3rd Cir. 2010). And the intervening years have not brought much additional clarity. Moreover, the Sixth Circuit has yet to expressly address this issue in binding authority. *Osterman*, 2020 WL 6708873, at *4 (collecting authorities).

That said, those "sparse" decisions that have examined the question, "have generally concluded that there are three components to a commission-based compensation scheme: (1) the employee's compensation must be tied to customer demand or the quantity of sales; (2) the compensation plan must provide performance-based incentives for the employee to increase his or her income; and (3) there must be proportionality between the value of the goods or services sold, and the rate paid to the employee." *Owopetu v. Nationwide CATV Auditing Servs., Inc.*, No. 5:10-cv-18, 2011 WL 883703, at *4 (D. Vt. Mar. 11, 2011) (internal citations omitted); *see also, e.g., Dyal v. PirTano Constr., Inc.*, No. 12 C 9687, 2018 WL 1508487, at *9 n.10 (N.D. Ill. Mar. 27, 2018) (same); *Taylor v. HD and Assocs., LLC*, No. 19-10635, 2020 WL 7075348, at *5 (E.D. La. Dec. 2, 2020) (same); *Roeder v. Directv, Inc.*,

40

No. C14-4091-LTS, 2017 WL 151401, at *29 (N.D. Iowa Jan. 13, 2017) (same). The Court addresses each of these factors below.

### A. Plaintiffs' Compensation Was Tied To Customer Demand.

To demonstrate that Plaintiffs were paid in commissions, CFI must first show that the compensation Plaintiffs received was tied to customer demand or the quantity of sales. This element can only be understood in light of the distinction the FLSA draws between commission-based work (which may be exempt from overtime if certain conditions are met) and piecework (which is never exempt from the FLSA overtime requirement). *Compare* 29 U.S.C. § 207(i), *with* 29 U.S.C. § 207(g); *see also Yi v. Sterling Collision Ctrs.,* 480 F.3d 505, 510 (7th Cir. 2007); *Alvarado v. Corporate Cleaning Servs, Inc.,* 782 F.3d 365, 367 (7th Cir. 2015). For example, in *Yi,* the Seventh Circuit found that a mechanic who was paid by the job was a commission-earning employee rather than a piecework employee, and was thus exempt from overtime. 480 F.3d at 510. As *Yi* explained, the mechanic's job was not piecework

> any more than selling real estate is piecework. You can spend 40 hours a week making quilts, and be paid by the quilt, and you won't be in the position of having to work overtime one week in order to make up slack time in the previous week. But if you're paid by the sale, you can't count on working steadily the same amount of time week after week, because sales depend on buyers' decisions, which are unpredictable; in the present case sales depend on the flow of wounded cars into each of [the employer's] local repair shops.

*Id.* Accordingly, *Yi* suggests that for an employee's compensation to constitute a "commission" for FLSA purposes, the compensation must be directly tied to customer

demand or the quantity of sales, or in other words tied directly to the revenue that the employer generates based on the activity. *See also Alvarado*, 782 F.3d at 367.

Plaintiffs' compensation clearly met this condition during the period in which they worked on a per yard basis. As Plaintiffs explain, "CFI paid set amounts for yards installed, carpet removed, and furniture moved." (Summ. J. Opp'n, Doc. 70, #4345). Thus, if customers needed more yards of carpet installed, Plaintiffs (and CFI) would earn more; conversely, if customers needed fewer yards of carpeting installed, Plaintiffs (and CFI) would earn less. This stands in contrast to the Seventh Circuit's description of piecework in *Yi*, where a piecework employee would continuously make the same amount for every quilt he or she produced—regardless of whether or not customers were actually *buying* those quilts when the worker was producing them. Stated differently, here Plaintiffs here were paid by the amount of carpet they installed, and the amount of carpet they were able to install was inextricably tied to customer demand.

To expand on that a bit, in the piecework context, such as the quilt-making example *Yi* provides, the work ostensibly can continue even absent immediate customer demand, as the productive output can go to the employer's inventory (for satisfying later customer demand). What that means, in turn, is that it appears that "piecework" refers to situations in which the employer is taking the risk that the goods produced will not sell. That is, as to piecework, the employer's obligation to compensate the employee is tied purely to the completion of the work, rather than being tied to the employer itself generating revenue from that work.

42

The Seventh Circuit in *Alvarado* explains it in very similar terms in explaining why the window washers there, who were paid on a "point system" based on expected complexity of work, were commission workers rather than piecework workers:

> There are real differences between the two compensation systems (commission and piecework), and the reality, which overcomes the nomenclature, is that CCS's system is a commission system. In a piece-rate system a worker is paid by the item produced by him: so much per scarf, for example, if his job is to make scarves. In a commission system he is paid by the sale—so if he works for a shoe store he's paid a specified amount per pair of shoes that he sells. Thus the scarf worker is paid for making scarves even if they haven't been sold—that is, even if he's producing for inventory—while the shoe salesman is paid only when he makes a sale.

782 F.3d at 367.

With the service here, CFI could not "inventory" excess installation services in one week and use those inventoried hours to cover excess customer demand the next week. Rather, "as in the shoe store example, the [carpet installers] are paid only if there's been a sale, namely a sale of [carpet installation] service to a [customer]." *Id*. In other words, the delivery of the carpet installation service is what generates revenue both for the employee (who was paid on a per yard basis) and the employer (who was also earning revenue from Home Depot on a per yard basis). That satisfies the compensation-is-tied-to-customer-demand aspect of a "commission" as that term is used in case law.

### B. Plaintiffs' Compensation Provided Performance-Based Incentives.

The next element courts commonly look to in determining whether an employee earned "commissions" is whether the compensation provided a

performance-based incentive for the employee to increase his or her income. As previously discussed, during the period in which they worked on a per yard basis, Plaintiffs were paid largely based on the amount of carpet they installed. CFI argues that this system gave Plaintiffs an incentive to work more quickly because Plaintiffs were assigned new jobs "all the time." Thus, if they completed a job ahead of schedule, CFI could assign Plaintiffs a new job, thereby allowing them to earn more. (Summ. J. Reply, Doc. 77, #4440). Plaintiffs, on the other hand, argue that "CFI almost never assigned them a new installation once they completed their last scheduled installation for the day," and thus Plaintiffs did not actually stand to financially benefit if they finished a job early. (Summ. J. Opp'n, Doc. 70, #4360).

As an initial matter, the Court notes that the term "performance-based incentive" is somewhat amorphous, and prior case law has struggled to determine what *types* of incentives will satisfy this requirement. To be sure, both sides in this case appear to assume that only financial incentives will suffice. That is, CFI argues that a steady flow of new jobs was available, such that Plaintiffs had the opportunity to increase their income by working faster, and thereby accepting and completing more jobs. (Summ. J. Reply, Doc. 77, #4440). On the other hand, Plaintiffs argue that new jobs typically were not assigned if work was completed ahead of schedule, and thus there was no financial incentive to complete a job quickly. (Summ. J. Opp'n, Doc. 70, #4360).

In contrast to the parties' arguments on this prong, though, case law is not entirely clear that the performance-based incentives that arise under a compensation

44

system must be financial in nature to show that the compensation constitutes a commission. For example, in *Klinedinst v. Swift Investments, Inc.,* the Eleventh Circuit held that an automotive painter earned commissions because he was paid by the job and thus had "an incentive to work quickly." 260 F.3d 1251, 1256 (11th Cir. 2001). Of course, this "incentive to work quickly" *may* have translated to financial gain because the employee might have been able to take on more work if he finished jobs quickly. However, the Eleventh Circuit did not require the employer to show those additional jobs were in fact available as a basis for finding that the compensation system provided the requisite "performance-based incentive." *Id.* Thus, *Klinedinst* at least tacitly suggests that an incentive need not strictly be *financial* in nature to find an employee receives commissions. Rather, even if no new jobs might be available on a given day, the "performance-based incentive" may take the form of allowing an employee who works faster to leave work earlier. Stated differently, under *Klinedinst,* the possibility of *time off* for higher-performing employees may count in favor of finding a "commission" just as much as compensation systems where the incentivize takes the form of a financial reward.

Other courts, however, have interpreted the performance-based-incentive prong more narrowly. These courts suggest that, to be considered a commission, a compensation-system must provide *financial* incentives for speed or efficiency. For example, in *Almanzar v. C & I Associates, Inc.*, the Southern District of New York found that a group of employees did not earn commissions because, although they were paid by the job, "work assignments were not assigned based on a technician's

45

speed or efficiency" and the employer "assigned work in advance based on the specific hours that a technician was available each day." 175 F. Supp. 3d 270, 276 (S.D.N.Y. 2016). In reaching that conclusion, the Court rejected the notion that "an employer can satisfy section 207(i)'s commission requirement when a compensation scheme incentivizes employees to work faster alone without any actual increased pay as a result." *Id.* at 276–77. Instead, the Court concluded that "[a] true commission system must … provide performance-based incentives for the employee *to increase his or her income.*" *Id.* at 277 (quotation marks omitted).

The Court concludes that it need not resolve this potential conflict here, though, as even if a performance-based incentive must be financial in nature, the Court finds that requirement is satisfied here. To be sure, there remains some dispute between the parties as to whether CFI would assign Plaintiffs "an additional installation to start … if [they] were to finish early." (*See, e.g.,* Couch Decl., Doc. 68-2, #4279). But that point is largely irrelevant. Even if Plaintiffs argue that they generally were not assigned "*new* installations to *start*" if they finished early, it is undisputed that Plaintiffs could be sent to assist their colleagues on an *ongoing* installation if they became available. Indeed, Plaintiff themselves state that, although "they did not testify that CFO assigned them new installations to start after completing their last assigned installation," Plaintiffs did "acknowledge[] during their depositions that CFI asked them to help other installers in the field." (Strike Opp'n, Doc. 79, #4451; *see also* Hensley Dep., Doc. 55, #1063 ("[I]f we were done at a certain time in the day … [CFI] would make us go help other people ….")). Moreover,

the parties do not dispute that, if that occurred, Plaintiffs would receive additional compensation (albeit at a lower per yard rate) for this extra work. (*Id.* at #1063; Walker Dep., Doc. 67, #3867). Thus, because both parties agree that additional work—resulting in additional income—was available to Plaintiffs if they worked quickly, the Court finds that the per yard compensation scheme that CFI employed provided performance-based incentives for carpet installers.

### C. Plaintiffs' Compensation Was Proportional.

The third element courts generally look to in determining whether an employee earned commissions is whether there is proportionality between the value of the goods or services sold, and the rate paid to the employee. Here, CFI argues that the proportionality requirement is met. As CFI's Motion for Summary Judgement States,

> [d]uring the relevant period, The Home Depot paid CFI $5.35 per sq. yard for installation of carpet, $0.18 for take up and haul away, $0.16 for moving furniture and $45.00 for a busted job. Plaintiffs were paid between $1.50 and $1.65 per sq. yard for installation of carpet, up to $2.00 per sq. yard, $.05 for take up and haul away, $0.05 for moving furniture and between $25-50.00 for a busted job. The Home Depot paid CFI $125.00 minimum for every job and CFI paid Plaintiffs a minimum of $50.00. Plaintiffs were averaging 30–37% commission on services provided to CFI.

(Summ. J. Mot., Doc. 61, #3478 (internal citations omitted)).

Plaintiffs do not dispute these figures. Instead, they argue that the system CFI describes does not satisfy the "proportionality" requirement needed to make these payments true commissions. Specifically, Plaintiffs argue that the proportionality requirement is not met because (1) "CFI paid Plaintiffs different rates among them without adjusting the amount it charged The Home Depot based upon which Plaintiff

performed the work," (2) "CFI paid Plaintiffs different rates themselves through the relevant period without changing the amount it charge The Home Depot," and (3) "for significant periods of Plaintiffs' employment, CFI paid them additional pay based upon them recording more than 40 hours in a workweek." (Summ. J. Opp'n, Doc. 70, #4357–58).

As this Court has previously explained, "[w]hen an employer can demonstrate the required relationship between an employee's compensation and the company's sales, courts generally find proportionality." *McAninch v. Monro Muffler Brake, Inc.*, 799 F. Supp. 2d 807, 815 (S.D. Ohio 2011). For example, in *Horn v. Digital Cable & Communications,* the Court found that the employees, who delivered, installed, and serviced equipment for a cable company, satisfied the proportionality requirement because "compensation [was] based on a direct percentage compensation system of what [the plaintiffs' employer] earn[ed] for the services Plaintiffs provide[d], and Plaintiffs' commission rates var[ied] and [were] proportional to the amount Defendants charge[d] [the customer] for that particular service." No. 1:06-cv-325, 2009 WL 4042407, at *4 (N.D. Ohio Feb. 11, 2009). Specifically, the Court noted that the customer "pa[id] [the plaintiffs' employer] $16.92 for a digital box installation; [the] [p]laintiffs earn[ed] 65% commission ($11.00) and [their employer] retain[ed] 35% of the revenue ($5.92)." *Id.*

The Court finds the proportionality requirement is likewise satisfied here. As in *Horn,* the Plaintiffs here were always paid directly in proportion to what CFI received from the customer. That is, the majority of both CFI's income and Plaintiffs'

48

income were each directly tied to the square yards of carpet installed or removed at a given job. Accordingly, increasing the yards of carpet installed meant that both CFI (from Home Depot) and Plaintiffs (from CFI) received greater compensation, and the increases in both were in direct proportion to that increase in yards. Likewise, if a job was smaller (i.e., fewer yards installed), then both CFI and Plaintiffs would make less based on their established rate per yard. This is a proportional system.

To be fair, it appears that, during the period in which Plaintiffs worked as Carpet Installers, neither they nor CFI referred to the Plaintiffs' compensation in terms of percentages of the amount paid by the customer. Rather, it appears that both parties tended to describe Plaintiffs' pay in terms of yards of carpet installed or removed. However, the facts that none of the parties *referred* to the payment in percentage terms is not dispositive on the proportionality inquiry. Indeed, in *Parker v. NutriSystem, Inc.,* the Third Circuit expressly declined to adopt a rule requiring that a commission "be strictly based on a percentage of the end cost to the consumer." 620 F.3d 274, 283 (3rd Cir. 2010). Although that court noted that various other sources "suggest that a commission is typically calculated as a percentage of sales price—for example, a real estate broker receives 10% of a house's sale price or a paint salesm[a]n receives 20% of his sales—both the Department [of Labor] and other courts have recognized that this strict percentage relationship is not a requirement for a commission scheme …." *Id.* (citing Dep't of Labor Op. Ltr., 2005 WL 3308624 (Nov. 14, 2005); *Yi,* 480 F.3d at 508). This Court agrees. Accordingly, the mere fact

that neither CFI nor Plaintiffs tended to describe the Plantiffs' pay in percentage terms does not prevent the Court from finding that Plaintiffs earned commissions.

Plaintiffs' other arguments against finding the pay rate here was proportional are also unavailing. Specifically, Plaintiffs argue that the pay rate here was not proportional because CFI paid Plaintiffs different rates among them, even though it charged the customer the same amount; similarly, individual Plaintiffs also earned different rates during the relevant period, either because their standard rate per square yard changed or because they earned additional pay based on recording more than forty hours in a workweek. These arguments all turn on the same general principle: that because the proportions between what CFI earned from the customer and what Plaintiffs earned from CFI fluctuated over time and varied among the different Plaintiffs, Plaintiffs' compensation cannot be properly characterized as commissions.

The Court is not persuaded. Admittedly, it is undisputed that, although the rate per yard Home Depot paid CFI never changed, different Plaintiffs were paid different amounts per yard, and the individual Plaintiffs' rates also changed over time. But that does not mean that the resulting compensation could not be considered a "commission." Indeed, the Third Circuit considered, and rejected, in *Parker*, 620 F.3d at 284, an argument very similar to CFI's here. In *Parker*, telemarketers working for a company selling weight loss products received different commissions per sale depending on the time of the sale. For example, salespeople made greater commissions on a sale made during the evening or over the weekend versus what

50

they would otherwise make during regular work hours. *Id.* at 276. Nonetheless, the Third Circuit found this pay scheme met the proportionality requirement, noting that the practice of adjusting commission rates "encourage[d] sales staff to take undesirable shifts." *Id.* at 284. Similarly, in *Yi,* the Seventh Circuit found that a group of automotive technicians earned commissions, even though the proportions the technicians earned to what the customers paid varied among different technicians based on their varying skill and quality. 480 F.3d at 509. And, in *Alvarado*, that same court again rejected the notion that the compensation must bear an "identifiable and consistent correlation" to the price charged the third party (here, Home Depot), to count as a commission. 782 F.3d at 367. Likewise, then, here it is largely irrelevant that some Plaintiffs were paid more per square yard than others, or that Plaintiffs' rate of pay shifted over time. What matters is that both CFI and Plaintiffs were paid based on the same non-time-based[13] metric (i.e., per square yard), such that the employees' earnings were "proportional and correlated" to what CFI itself earned. *Id.* If, by contrast, the Court were to accept Plaintiffs' argument, that would mean that the compensation scheme would lose its eligibility under § 207(i) if CFI, for example, responded to a shortage in the labor market by increasing its employees' rate-per-yard, unless CFI concurrently raised the prices it charged its customers. Such a

---

[13] It is important that the metric be non-time-based, as otherwise the compensation would be a form of hourly wages. That is, one could imagine a compensation system here where CFI charged Home Depot for carpet installation on a per-installer-hour basis, and then CFI paid its installers on a per-hour basis at a lower rate. While the relationship between the two (i.e., what CFI received from Home Depot and what it paid its installers) would meet the proportionality requirement, the time-based aspect would mean that the compensation scheme would not meet the performance-based-incentive element described above. Thus, it would not qualify as a "commission."

51

reading of the proportionality requirement strikes the Court as both unreasonable and impractical, and it declines to adopt it here. Thus, the Court finds CFI has satisfied the proportionality requirement.

### D.     Plaintiffs Were Able To Influence Customer Buying Decisions.

Finally, Plaintiffs argue that the Court should apply a fourth requirement in determining whether CFI satisfies the commission-earning defense. Specifically, Plaintiffs argue that they were not commission-earners because they "had no opportunity to influence the buying decisions of the customers of The Home Depot." (Summ. J. Opp'n, Doc 70, #4359). CFI disputes that the commission exemption includes any requirement that the employee have the ability to influence customers' buying decision. (Summ. J. Reply, Doc. 77, #4440). Moreover, even if such a requirement does apply, CFI argues that it is satisfied here because Plaintiffs were required to "'check-in' with customers and go over work orders. They made sure the work order was complete, or they would add additional services as necessary." (*Id.*). Thus, CFI argues, "Plaintiffs' direct interaction gave them the opportunity to influence customers' decisions and enjoy additional revenue based on those decisions." (*Id.*).

As an initial matter, the Court is skeptical that the commission-exemption to the FLSA's overtime rules applies only when employees have the ability to influence customer decisions. Indeed, as Plaintiffs themselves note in their Opposition, (Doc. 70, #4359), the Department of Labor's interpretive guidance on the FSLA states that

> [a]lthough typically in retail or service establishments commission payments are keyed to sales, the requirement of the exemption is that more than half of the employee's compensation represent commissions 'on goods or services,' which would include all types of commissions customarily based on the goods or services which the establishment sells, *and not exclusively those measured by 'sales' of these goods or services.*

29 C.F.R. § 779.413(b) (emphasis added). The Court struggles to reconcile the regulations' instruction that commissions need not be based on "sales" of goods or services with Plaintiffs' argument that the commission exemption requires that an employee be able to "influence the customers' buying decisions." Admittedly, the Department's interpretive guidance on this matter is merely persuasive rather than binding precedent. *Doe v. Butler Amusements, Inc.*, 71 F. Supp. 3d 1125, 1133 (N.D. Cal. 2014) ("These rules are not binding on courts but are followed to the extent that they are persuasive based on the thoroughness and consistency of their reasoning."). However, particularly given the dearth of binding case law explaining the contours of "commission," the Court finds the Department of Labor's viewpoint on this issue is persuasive.

Additionally, Plaintiffs' argument is not well-founded in case law. Admittedly, in both *Parker* and *Horn,* the courts noted that the employees' role in influencing the customers' buying decisions weighed in favor of finding that the employees were commission earners. *Parker,* 620 F.3d at 282; *Horn,* 2009 WL 4042407, at *6. However, neither case indicated that this factor was dispositive—rather, it was one of multiple factors pushing in favor of the courts' findings. Similarly, in *Adami v. Cardo Windows, Inc.,* the court stated that the fact that the employees had no role in

selling windows counseled against finding that they earned commissions—but again, this was only one factor of multiple that led to the Court's ultimate decision finding that the employees were not overtime-exempt. No. 12-2804, 2014 WL 2586933, at *6. (D.N.J. 2014). Accordingly, while Plaintiffs have precedent showing that the Court may consider Plaintiffs' ability to influence customers' decisions in conducting its analysis, Plaintiffs have not shown that this factor is a dispositive element.

On the other hand, there are many cases where courts have determined that employees received bona fide commissions without any apparent showing that the employees at issue had any ability to influence customers' buying decisions. For example, in *Jelus v. All Creatures Animal Hospital,* the Court found that a pet groomer employed at a veterinary clinic earned bona fide commissions without making any findings as to whether the groomer had the ability to influence the customers' purchases. No. 1:15-cv-184, 2016 U.S. Dist. LEXIS 69858, at *4–6 (S.D. Ohio May 26, 2016); *see also Whitt v. Ziegler Tire & Supply Co.,* No. 5:14-cv-886, 2015 WL 4715605, at *4–8 (N.D. Ohio Aug. 7, 2015) (finding an automotive technician earned commissions without discussing whether the mechanic had the ability to influence customer buying decisions); *Yi*, 480 F.3d at 509–511; *Klinedinst,* 260 F.3d at 1254–56. Indeed, as the Seventh Circuit has observed, although a "sales commission" may be the most common type of commission, "persons not engaged in the sale of goods—receivers, trustees, bailees, and others—are sometimes compensated in the form of what are commonly called commissions … within the

54

meaning of 29 U.S.C. § 207(i) …." *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1175 (7th Cir. 1987).

Moreover, even if the ability to influence customers' buying decisions is a necessary predicate for finding that the commission exemption applies, this requirement is satisfied here. Plaintiffs themselves concede in their Declarations that, after they arrived at job sites and began interacting with the customers, they sometimes would discover that they needed to modify job specifications. (*See, e.g.,* Couch Decl., Doc. 68-2, #4279 ("Changes to work orders had to be made at certain times because either the customer requested a change, or we could not perform the installation based upon the work order.")).  In those cases, they would contact Walker or Adkins and the customers would finalize any changes with them. (*Id.*).  In that sense, Plaintiffs provided CFI with an opportunity to help sell customers extra services on the ground—thus, at least at some level, they had the ability to influence customers' buying decisions.

Plaintiffs argue otherwise, claiming that they did not have the power to finalize any sales. In other words, they claim that they had to "contact Ms. Walker or Mr. Adkins … so Ms. Walker or Mr. Adkins could speak directly with the customer." (Summ. J. Opp'n, Doc. 70, #4359). But so what? Even if a "commission" requires that an employee be able to *influence* customer buying decisions as Plaintiffs claim, (Summ. J. Opp'n, Doc. 70, #4359), that does not mean that the employee also would need to be able to *finalize* a customer sale. To the contrary, "influencing" customers'

55

buying decisions involves a much broader spectrum of activity than merely finalizing a sale to a customer.

Accordingly, even if an employee must be able to influence a customer's buying decisions for the employee's proportional compensation to count as a "commission," the Court finds there is no genuine dispute that this requirement is satisfied here.

*   *   *

Having found present here each of the elements that case law has recognized as necessary to a commission-based compensation system, the Court concludes that the per yard compensation scheme that CFI employed is subject to § 207(i). In reaching that result, the Court acknowledges that the definition of "commission" resulting from the elements reflected in the "sparse" case law addressing that term perhaps does not exactly track the way that the word "commission" is used in common parlance. Typically, the word "commission" refers to situations where an employee (or agent) earns a percentage of the revenue that an employer (or principal) receives in connection with a transaction. Perhaps the most common example would be a real-estate commission, where the seller agrees to pay the agent a percentage of the sale price. As more fully explained above, though, existing case law defines the term "commission" under § 207(i) to include a broader set of arrangements. As relevant here, that extends to arrangements where both the employer and the employee earn compensation at the same time (i.e., transaction-based compensation), based on the same non-time-based metric (i.e., thereby giving rise to proportionality between the compensation that each receives), thus aligning the incentives between the employer

and employee (as both generate greater revenue in the same manner, here by increasing the yards of carpet installed), and incentivizing employees to work more quickly and efficiently. Absent Sixth Circuit precedent suggesting a different result, the Court adopts the definition set forth in that case law. Thus defined, the per yard compensation system here constitutes a "commission."

###### ii.     It Is Unclear Whether Plaintiffs Made More Than 1.5x The Minimum Wage.

That Plaintiffs' per yard compensation took the form of a commission, though, is not the end of the inquiry. For an employee to qualify as overtime-exempt under § 207(i), the employer also must show that the employee was "paid a regular rate of more than one and a half times the federal minimum wage." *Hanna*, 2019 WL 7482143, at *2. Here, both CFI and Plaintiffs agree that the figure representing "one and a half times the federal minimum wage" during the relevant period was $10.88. (Summ. J. Mot., Doc. 61, #3481; Summ. J. Opp'n, Doc. 70, #4361). Moreover, "[t]he 'regular rate' is an employee's total compensation converted to an hourly rate. If this rate does not exceed the minimum wage for a period, the exemption is lost for that period. When possible, the rate must be established on a weekly basis." *Jelus,* 2016 U.S. Dist. LEXIS 69858, at *8 (internal citations omitted).

Thus, the Court must determine whether, when dividing Plaintiffs' weekly income by their hours worked, Plaintiffs received more than $10.88 an hour every week when they worked on a per yard basis. As to that question, the parties do not appear to dispute what Plaintiffs earned, but rather only the hours they worked. CFI attempts to rely on Plaintiffs' timesheets, while Plaintiffs, as they have done at other

points in their arguments on this Motion, reject the hourly figures in those sheets as inaccurate. Applying CFI's time figures, CFI argues that there were no weeks when Plaintiffs earned less than $10.88 per hour worked. Plaintiffs, on the other hand, argue that their estimates of their time worked would yield at least some weeks where they earned less than $10.88 per hour.

Once again then, the question is whether, at the summary judgment stage, the Court is bound by the employer's timekeeping records in answering the 1.5 times minimum wage question. The Court has not identified any cases where the Sixth Circuit addressed this issue directly. And to the extent this Court has identified case law that indirectly addresses this question, it points in different directions. As noted above, *White* explains that generally "if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process." 699 F.3d at 876. This would suggest that CFI's timekeeping records are entitled to deference. On the other hand, the Sixth Circuit has also stated that § 207(i) is an "affirmative defense[] on which the employer has the burden of proof," *Wilks,* 278 F. App'x at 489—perhaps raising the question of whether the employer's timekeeping records suffice to carry the day in the face of sworn testimony that the timekeeping records are inaccurate.

Ultimately, however, the Court concludes that, even if CFI's timekeeping records would generally be entitled to deference under *White* in determining whether Plaintiffs made more than 1.5 times the minimum wage, they are not in this case. This is because, as previously discussed, during at least a portion of the time in which

Plaintiffs were paid on a per yard basis, it is not clear that CFI actually had a timekeeping policy in place that applied to Plaintiffs. Second, even when a timekeeping policy was in place, it remains unclear whether CFI was on notice that Plaintiffs were in fact working overtime, despite timekeeping records that may have suggested otherwise.

Accordingly, the Court finds that CFI's timekeeping records are not dispositive at the summary judgment stage. Thus, the Court finds summary judgment on whether Plaintiffs were exempt employees is inappropriate—but with an important caveat. The conclusion that summary judgment is inappropriate applies only to Plaintiffs' claims related to those weeks in which, *applying their own weekly time estimates*, they received less than 1.5 times minimum wage (i.e., $10.88) on an hourly basis. By contrast, for those weeks when, even applying Plaintiffs' time estimates, they received more than $10.88 per hour, the Court finds that CFI is entitled to judgment as a matter of law.

To implement this portion of the decision, the Court begins by reference to exhibits one through six to Plaintiff's Opposition to Defendants' Motion for Summary Judgment. (Docs. 69-1 through 69-6). These documents contain Plaintiffs' tables calculating their regular rates of pay during the relevant period, based on their estimates of their general hours worked per week. For any week listed in those exhibits in which a given Plaintiff's hourly rate of pay is allegedly less than $10.88, the Court will permit Plaintiffs to present evidence to the jury as to the number of hours that the Plaintiff in fact worked that week, the pay that the Plaintiff received

for that week, and the resulting hourly pay. By contrast, as to any week in those exhibits in which (1) the Plaintiff was receiving per yard compensation, and (2) the Plaintiff concedes he received over $10.88 per hour, the claim fails as a matter of law, and Plaintiffs cannot seek to provide evidence with regard to that week at trial.

There is one additional wrinkle. Plaintiffs' charts do not appear to address each week during which a given Plaintiff was allegedly working at CFI and receiving per yard compensation. For example, Belser began work as a carpet installer in April of 2017, and was paid during his entire tenure as a carpet installer on a per year basis. Yet, the Plaintiffs' chart for Belser begins on September 10, 2017. (*See* Doc. 69-1, #4319). Moreover, CFI had prepared a similar chart for each employee, which it submitted with its Summary Judgment Motion, and its chart for Belser likewise began on that same date. (*See* Doc. 60-5). When CFI filed its reply brief, though, it amended those exhibits, apparently correcting the dates to cover each Plaintiff's total period of employment on a per yard compensation basis. Its amended chart for Belser, for example, begins on April 2, 2017. (*See* Doc. 72, #4389). But, of course, a reply brief in support of summary judgment is not an appropriate vehicle for adding additional facts the party wishes it had submitted in connection with its motion. Accordingly, there appear to be weeks in which the parties agree that Plaintiffs were working on a per yard basis, but as to which there is currently no record evidence regarding the hours worked, making it impossible to determine the imputed per hour pay. As to those weeks, i.e., any weeks in which CFI compensated a given employee on a per yard basis, but as to which neither CFI (in its opening brief), nor Plaintiffs, submitted

60

the information necessary to calculate an hourly wage rate, Plaintiffs will be allowed to present evidence, if they can, showing that the hourly pay rate that the Plaintiff received for that week was less than $10.88.

The bottom line is this: as to any week in which the Plaintiffs' own charts show that a Plaintiff made more than $10.88 per hour during a week in which the Plaintiff was compensated on a per yard basis, the Court **GRANTS** summary judgment in favor of CFI on Plaintiffs' FLSA overtime claims. The Court declines to dismiss, however, those weeks that remain.

### 3.     Were CFI's Violations Willful?

Ordinarily, "an action for unpaid overtime compensation under the [FLSA] must be commenced within two years after the cause of action accrued, or shall be forever barred." *Terry v. Pro-Mark Contr., LLC,* No. 1:14-cv-2542, 2016 WL 3421399, at *5. The date at which a cause of action "accrues" and "commences" under the FLSA is specific to each individual plaintiff.

With regard to when the cause of action accrues, this Court has explained that "[w]hen a plaintiff alleges a violation of the FLSA based on a failure to pay overtime wages, each paycheck that fails to include wages for overtime constitutes a separate violation. Thus, a new cause of action accrues with the receipt of each paycheck." *Brittmon v. Upreach, LLC,* 285 F. Supp. 3d 1033, 1045 (S.D. Ohio 2018) (citing *Viciedo v. New Horizons Computer Learning Ctr. of Columbus, Ltd.*, 246 F. Supp. 2d 886, 902 (S.D. Ohio 2003)).

Likewise, an action is commenced under the FLSA either "(a) on the date when the complaint is filed, if [the individual plaintiff] is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought," or "(b) if such written consent was not so filed or if [the individual plaintiff's] name did not so appear," then the action commences "on the subsequent date on which such written consent is filed in the court in which the action was commenced." *Roby v. Lincoln Elec. Co.*, 534 F. Supp. 3d 863, 867 (N.D. Ohio 2021) (quoting 29 U.S.C. § 256).

Here, Plaintiffs were paid weekly. (Walker Dep., Doc. 67, #3856). Thus, a new cause of action accrued for each Plaintiff each week they were employed at CFI. As far as when the action commenced, Couch filed his opt-in notice on January 24, 2019—the date when the original Complaint was filed. (Doc. 1-2, #10). Julick and Crabtree filed their notices, respectively, on June 12, 2020 (Doc. 28-1) and July 9, 2020 (Doc. 31-1). Accordingly, under the FLSA's general two-year statute of limitations, Couch would not be able to pursue any claims related to overtime omitted from any paychecks dated before January 24, 2017. Similarly, Julick and Crabtree could not pursue claims related to overtime omitted from any paychecks dated before June 12, 2018, and July 9, 2018, respectively.

However, the two-year statute of limitations includes an exception that Plaintiffs argue applies in this case. Under 29 U.S.C. § 255(a), "a cause of action arising out of a willful violation [of the FLSA] may be commenced within *three years* after the cause of action accrued." (Emphasis added). "[A] plaintiff that argues the

62

three year statute of limitations is applicable and alleges willful conduct bears the burden of coming forward with sufficient evidence that the defendant acted willfully." *Hajiani v. ESHA USA, Inc.*, No.: 3:14-CV-594, 2017 WL 5163354, at *8 (E.D. Tenn. Nov. 7, 2017).

Here, Couch, Julick, and Crabtree worked on both an hourly basis and a per yard basis during the period between when the two- and three-year statutes of limitations would apply. Consequently, Plaintiffs offer separate evidence to demonstrate willfulness, with some evidence directed toward the time in which Couch, Julick, and Crabtree worked on an hourly basis, and some evidence directed to the time in which they were paid per yard.

With regard to the periods in which the relevant Plaintiffs were paid hourly, Plaintiffs argue that CFI's alleged violations of the FLSA were willful because CFI's attorney, Bob Winter, "advised CFI that Plaintiffs were entitled to overtime pay and CFI's own Handbook considered them 'Non-Exempt' while they were hourly." (Summ. J. Opp'n, Doc. 70, #4363). Moreover, Plaintiffs argue that "CFI's violation of [Couch, Julick, and Crabtree's] rights by altering their pay records is especially willful since it involved altering their time records." (*Id.*).

"A[n] FLSA violation is willful if 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" *Kordie v. Ohio Living*, No. 1:21-cv-3791, 2022 WL 610809, at *4 (S.D. Ohio Mar. 2, 2022) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). For example, in *Stewart v. CUS Nashville, LLC,* the court addressed a situation where "the

[employer] … maintained that it [was] company policy not to have employees work off-the-clock," but "[n]evertheless, despite the presence of this policy, the record evidence show[ed] that management … frequently altered the plaintiffs' time records so that the plaintiffs did not receive credit for hours actually worked." No. 3:11-cv-0342, 2013 WL 4039975, at *18 (M.D. Tenn. Aug. 8, 2013) (internal citations omitted). In light of these facts, the court held that the employer's "conduct demonstrate[d] a reckless disregard for the [FLSA]," and thus constituted a willful violation extending the statute of limitations. *Id.*

Much like in *Stewart,* here the Plaintiffs allege that CFI was aware of the FLSA's overtime requirements for non-exempt employees based on CFI's employee handbook and advice it received from its attorney. Similarly, as discussed previously, there remains a genuine dispute of fact as to whether CFI was altering Plaintiffs' time records to remove lunch breaks they never took. Thus, there remains a genuine dispute as to whether CFI was aware of the FLSA's overtime requirements for non-exempt employees and whether CFI was improperly adjusting employees' timesheets to deprive them of overtime. Accordingly, the Court declines to grant CFI summary judgment on any hourly claims on the grounds that they are barred by the statute of limitations, because there remains as genuine dispute as to whether these alleged violations were willful.

Turning to the per yard claims, CFI once again argues that any such claims falling outside the two-year statute of limitations are time barred. Plaintiffs, for their part, once again argue that the three-year statute of limitations applies in this case,

noting that CFI's attorney, Bob Winter, "testified that he advised CFI that CFI was legally required to pay Plaintiffs' overtime premium pay when CFI started paying them on a piece-rate basis." (Summ. J. Opp'n, Doc. 70, #4363–64). Thus, Plaintiffs argues that, because CFI "failed to follow Mr. Winter's advice in paying Plaintiffs' overtime premium pay, they acted willfully in violating the FLSA." (*Id.* at #4364).

The Court agrees that Plaintiffs have demonstrated a genuine dispute as to whether CFI acted willfully in allegedly violating the FLSA. In his deposition, Winter testified that, after CFI explained its plans to transition to a per yard compensation structure, "[he] gave them the advice that overtime pay was a consideration for the pieceworker." (Winter Dep., Doc. 63, #3519). Given that CFI was thus arguably on notice of the FLSA's overtime requirements and their potential applicability to its per yard carpet installers, the Court declines to grant CFI summary judgment on any per yard claims that may be barred by the FLSA's two-year statute of limitations.

### 4. Plaintiffs' State Law Claims

CFI also moves to dismiss Plaintiffs' state law claims under Ohio and Kentucky's respective overtime statutes. (Summ. J. Mot., Doc. 61, #3482).

The Court can easily resolve CFI's argument as to the Ohio law claims. As another court in this circuit explained, "[e]ven though [Plaintiffs] asserts … overtime claim[s] under both federal and [Ohio] law, [the Court] need consider only federal law on this issue, as the Ohio statute expressly incorporates the standards and principles found in the FLSA." *Whitt*, 2015 WL 4715605, at *3 (N.D. Ohio Aug. 7, 2015) (quoting *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007). This

65

Court agrees. Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** CFI's Motion for Summary Judgment on Plaintiffs' Ohio law claims consistent with the Court's treatment of Plaintiffs' FLSA claims.

Kentucky's state overtime statute requires a slightly more complicated analysis. Although Kentucky wage law generally parallels the FLSA in terms of requiring time and half for any hours in excess of forty that an employee works in a week, *see* K.R.S. § 337.285(1), the statute provides different exemptions than those included in the FLSA. Specifically, the Kentucky statute generally excludes from overtime requirements all "[e]mployees of retail stores engaged in work connected with selling, purchasing, and distributing merchandise, wares, goods, articles, or commodities." K.R.S. § 337.285(2)(a).

To determine whether Kentucky's "retail store" exemption applies, CFI argues that the Court should import the "retail establishment" prong of the FLSA's overtime exemption. (Summ. J. Mot., Doc. 61, #3482). Stated differently, under CFI's proposed construction, if an employee works in a retail or service establishment for the purposes of the FLSA, then that alone is sufficient to qualify for the "retail store" exemption under Kentucky law. Although that proposed statutory construction finds some support in case law, *see Henderson v. Pieratt's, Inc.*, No. 5:17-cv-377, 2019 WL 1903398, at *3 (E.D. Ky. Apr. 29, 2019), the Court need not decide this matter on the merits. That is because Plaintiffs failed to respond to CFI's argument on this point in their brief. (*See* Summ. J. Opp'n, Doc. 70). Accordingly, the Court finds that Plaintiffs have waived any opposition to this argument and adopts CFI's construction of

Kentucky's retail exemption here. *Echols v. Congress Collection, LLC*, No. 20-cv-12254, 2021 WL 3510934, at *4 (E.D. Mich. Aug. 10, 2021) (observing that the "failure to respond to an argument amounts to a waiver of that issue").

In this case, as already discussed, neither side disputes that Plaintiffs were employees of a retail establishment under the FLSA. Based on the statutory construction the Court has adopted in this case, that means Plaintiffs also worked for a retail store under K.R.S. § 337.285(2)(a) and are exempt from Kentucky's overtime requirements. For that reason, the Court **GRANTS** CFI's Motion for Summary Judgment with regard to Plaintiffs' overtime claims under Kentucky law.

### 5.   Couch Is Not Judicially Estopped From Pursuing His Claims Against CFI.

Finally, CFI argues that the Court should dismiss all of Couch's remaining claims under the doctrine of judicial estoppel because Couch failed to declare them in Chapter 7 bankruptcy proceedings prior to initiating this action. (Summ. J. Mot., Doc. 61, #3484–85). CFI previously raised this same argument in its Motion to Dismiss. (Mot. to Dismiss, Doc. 10-1, #74–75). Because both parties submitted materials outside the pleadings in briefing that Motion, the Court converted it into a Motion for Summary Judgment, which the Court then denied. (Op., Doc. 21, #254–55).

In that prior Opinion, the Court already discussed the doctrine of judicial estoppel in the bankruptcy context at length. Consequently, the Court considers it unnecessary to reiterate the entire analytical framework here. (*Id.* at #256–65). Suffice to say, in the bankruptcy context, judicial estoppel applies if (among other things) a party's factual omission was not a result of mistake or inadvertence. (*Id.* at

67

#256–57 (citing *Wyndham Vacation Ownership, Inc.*, 617 F.3d at 476)). In determining whether there was mistake or inadvertence, the Court must ask if (1) the party lacked knowledge of the factual basis of the undisclosed claim; (2) the party had no motive for concealment; and (3) there is an absence of bad faith. (*Id.* at #257 (citing *Wyndham Vacation Ownership, Inc.*, 617 F.3d at 476–77)).

Applying that framework, the Court's prior Opinion found that Couch had knowledge of the factual basis of his claims against CFI and a motive to conceal them. (*Id.* at #257–58). However, the Court found the doctrine of judicial estoppel did not apply because a genuine dispute remained as to whether Couch had acted in bad faith. (*Id.*). The Court reached this conclusion by relying on Couch's contentions that he (a) relied on the incorrect advice of his bankruptcy attorney in not disclosing his potential claims, (*id* at #262), and (b) took corrective steps after receiving a letter from CFI that alerted him to the issue. (*Id.* at #263–64).

CFI now argues, though, that the Court "was not privy to all information" when it previously adjudicated this matter and should thus revisit its decision. (Summ. J. Mot., Doc. 61, #3485). Although CFI's argument here would suggest that it has discovered new information, the Court is unsure what that new information might be. Indeed, almost all of the documents CFI's Motion cites for support on this issue were in the record before the Court issued its last Opinion denying CFI summary judgment. (*Id.* (citing, e.g., Couch Bankruptcy Pet., Doc. 10-2; Couch Order of Discharge, Doc. 10-3)). The only *potentially* new information comes from Couch's deposition, where Couch testified that, prior to initiating his bankruptcy proceedings,

Couch knew that he had claims against CFI and had consulted counsel regarding these claims. (*Id.* (citing Couch Dep., Doc. 57, #2167–68)). But the Court's prior decision acknowledged that Couch was aware that he had claims against CFI prior to filing his bankruptcy petition. (Op., Doc. 21, #257–58). Thus, knowledge is not the issue. Rather, to prevail on this issue, CFI must show new information that Couch acted *in bad faith* in failing to disclose his potential claims. Because CFI fails to present any new information on that issue, the Court declines to revisit its previous determination there remains a genuine dispute as to whether Couch acted in bad faith in failing to disclose his potential claims against CFI in his bankruptcy proceedings. Accordingly, the Court **DENIES** CFI's Motion for Summary Judgment on Couch's remaining claims based on the doctrine of judicial estoppel.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART**, **DENIES IN PART**, and **DENIES AS MOOT IN PART** CFI's Motion to Strike (Doc. 76) Plaintiffs' Declarations (Docs. 68-1 through 68-6) in Opposition to CFI's Motion for Summary Judgment. Further, the Court **GRANTS IN PART** and **DENIES IN PART** CFI's Motion for Summary Judgment (Doc. 61).

**SO ORDERED.**

April 29, 2022
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

69